06-0644-op
In re Sims

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: January 16, 2008          Decided: July 18, 2008)
Final brief submitted: February 15, 2008


Docket No. 06-0644-op

_____


IN RE: NATHANIEL SIMS

- - - - -

NATHANIEL SIMS,

Petitioner,

- v. -

MIKE J. BLOT, Correctional Officer, FRANCISCO CARABALLO, Correctional Officer,

Respondents.

_____

Before: KEARSE, LEVAL, and CABRANES, Circuit Judges.

Petition for a writ of mandamus to reverse an order of the United States District Court for the Southern District of New York, Loretta A. Preska, Judge, requiring petitioner, who has asserted claims pursuant to 42 U.S.C. § 1983 for use of excessive force but is not seeking damages for mental or unusual emotional injury, to disclose his mental health records to respondents.

Petition granted; order reversed.

ANTONY L. RYAN, New York, New York (Jeffrey B. Korn, Josef M. Klazen, Cravath, Swaine & Moore, New York, New York, on the brief), for Petitioner.

ROBERT C. WEISZ, Assistant Solicitor General, New York, New York (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Senior Counsel, New York, New York, on the brief), for Respondents.

KEARSE, Circuit Judge:

Petitioner Nathaniel Sims, a New York State ("State") prisoner who is pursuing an action pursuant to 42 U.S.C. § 1983 against State corrections officers for the alleged use of excessive force against him on December 20, 1999, seeks a writ of mandamus to set aside a discovery order of the United States District Court for the Southern District of New York, Loretta A. Preska, Judge, requiring disclosure of Sims's privileged psychiatric treatment records for the period December 20, 1997, through January 20, 2000. The district court ruled that Sims's deposition testimony as to communications with mental health professionals waived his privilege of confidentiality with respect to psychotherapist-patient communications, and that fairness required that Sims disclose his psychiatric records to respondents notwithstanding his withdrawal of any claims for emotional injury damages beyond those ordinarily associated with a conventional claim for pain and suffering resulting from an assault and physical injury, and his renunciation of any reliance on evidence as to, inter alia, his fears of corrections officers. In his petition for mandamus, Sims argues principally that the district court erred as a matter of law in finding (a) that he had waived the privilege, and (b) that there would be unfairness in denying respondents' access to his mental

-2-

health records. For the reasons that follow, we grant the writ of mandamus and reverse the order for disclosure.

# I. BACKGROUND

The present petition arises out of an altercation that occurred on December 20, 1999 (the "December 20 incident") during a routine strip frisk of Sims, who was then an inmate at New York's Sing Sing Correctional Facility ("Sing Sing"). Sims contends that respondents Mike Blot and Francisco Caraballo, Sing Sing corrections officers, physically assaulted him without provocation or justification. Respondents contend instead that Sims started the altercation. The history of the proceedings leading to this petition--spanning two actions--is not in dispute.

## A. The Proceedings in the Original Action

Sims initially filed a § 1983 complaint pro se in the Southern District of New York ("SDNY") in February 2000 ("Pro Se Complaint" or "original complaint"), using the SDNY complaint form for pro se prisoners, against respondents and seven others (collectively "defendants"), requesting money damages, injunctive relief, and termination of the defendants' employment. With respect to Blot and Caraballo, the complaint described the December 20 incident as follows:

> I was told to stay facing the wall[,] hand back my
> shirt. This done I was told to hand back my shoes.
> This done I was told to remove my pants and hand
> them back. When I reached down to take my pants

off, C.O. M. Blot punched me in the back of my head and then grabbed me around my chest pinning my arms at my side and slammed me to the floor. At this time C.O.s Carabello [sic], White, and McDonough commensed [sic] to kick, stomp and punch me about my head, neck, shoulders and back. I yelled out for Sgt. Hasse to come and intervene to no avail. While I was struggling to cover up from being either kicked or punched in a vital area, my feet was grabbed and held by someone while C.O. M. Blot placed his knee in my side and kept punching me in my head. C.O. F. Caraballo, [sic] shouted, "You hit a f---ing officer, you piece of s---, we'll kill you." At this time, C.O. F. Caraballo, [sic] pulled his pocket knife and swung down in a stabbing motion. I twisted away as best I could but was cut by his knife anyway. . . .

(Pro Se Complaint Item IV.) In response to the SDNY complaint form's instruction to describe any injuries sustained, Sims stated, "I received a laceration over eye that required five [5] steri-strips to close; I also had swelling to right shoulder, pain medication given." (Id. Item V-A.)

In August 2003, after the claims against all of the defendants other than Blot and Caraballo had been dismissed, either on summary judgment or by stipulation, Sims's complaint was dismissed on the ground that he had failed to exhaust his administrative remedies. In the meantime, there were discovery proceedings in 2000-2002 leading to the order at issue here.

Defendants scheduled Sims's deposition for December 2000. Sims asked the district court either to relieve him of the obligation to give pretrial testimony in the form of a deposition or to appoint counsel to represent him. The court denied both requests in an order filed on November 28, 2000, and denied a renewed request for the appointment of counsel in an order filed on December 11,

2000. The court stated that Sims would be allowed to renew his request for assignment of counsel after submitting a copy of the transcript of his deposition.

1. Sims's Deposition

Defendants proceeded to depose Sims. Assistant Attorney General ("AAG") Nicola N. Grey, representing the defendants, questioned Sims, representing himself.

> Q. Can you please describe for me what happened to you on December 20th, 1999?

> A. Yes. I was coming back into the special housing unit at Sing Sing from the hospital, and Officers Blot, Carabello [sic], White, and McDonough were standing around the strip frisk area waiting for me to come in. When I got in I had a few words with Officer Blot which basically stem from prior confrontation I had with him a week earlier. While I was standing there waiting to get processed back in the guy from [the Inspector General's office] came in and I tried to stop him to speak to him, let him know that I had a feeling that this was about ready to get a little bit out of hand, and I wanted him to stick around. He said that he couldn't stop at that particular moment, but he would come see me a little later on.

(Deposition of Nathaniel Sims, December 28, 2000 ("Sims Dep."), at 15.) Sims stated that he began removing items of clothing as instructed by Blot, and

> while I was taking my pants off he hit me.

> Q. Then what happened after that?

> A. Rushed me, grabbed me, bear hug, threw me to the floor, and the rest of the officers commenced to helping [sic] him out here. In the process of that--

> Q. What do you mean by helping him out?

> A. Helping him to physically assault me. In

the process of that, Officer Carabello [sic] yelled out to me: You hit an officer! I'll kill your effen' behind. Okay. So while they was punching on me and everything I seen him swing down, I moved my head and he cut me [with a knife]. . . . Eventually they put handcuffs and shackles on me and rushed me down to the ER.

(Id. at 16.)

Sims testified that he was returned to the special housing unit ("SHU") on the night of the incident; but on the next day, he was moved back to the hospital and placed in the psychiatric satellite unit ("PSU"). (See id. at 18.) Sims stated that he was not on PSU status at that time but was kept in the PSU for several weeks thereafter "for security reasons." (Id.) The AAG questioned Sims about his PSU status:

Q. Okay. I want to direct you to your complaint. It states in your complaint that you were being returned from PSU, mental health unit, prior to the incident?

A. Yes.

Q. Did you have PSU status at that time?

A. At that time I did, yes.

Q. So on 12/20/99 prior to--

A. Prior to that.

Q. --prior to returning to the SHU you had--

A. I was admitted on the PSU.

Q. How long were you in PSU?

A. From the 13th, 12/13 to--no, 12/13/99. Pardon me.

Q. And why were you admitted to the PSU?

A. They thought I was kind [of] bugging. What happened was I punched the plexiglas and broke it,

-6-

and cut my hand. This is basically what started all this. Officer Blot and Officer Carabello [sic] had just beaten up on a crazy inmate and I spoke up. That's basically what happened. And because of that it escalated to--first they was talking about coming to my cell, and I was like: All right! Fine! We can do that. And I had a pen, and I had a cup of liquid detergent and they was saying that I was threatening to throw it on them, this crazy nonsense. But that's what started all this. That's where the week earlier came from where we had the words.

. . . .

. . . What they end up doing was moving me and putting me behind glass. And I felt that there was no need to be placed behind glass because I hadn't thrown anything, hadn't threatened to throw anything, so I broke the glass.

. . . .

Q. And after you broke the glass what happened?

A. Well, because I end up cutting myself with the glass they felt that I was really, really out of it. They sent me upstairs to PSU to calm down, basically. And I ended up staying up there for about a week. I came back that Monday which was [December] 20th. I believe that was the Monday.

Q. Okay. So, prior to getting escorted to SHU they took you off of PSU status.

A. Right.

(Sims Dep. 24-28.)

One of those sued by Sims in his original complaint was Lorraine Del Santo, a psychiatric nurse. Asked why he had made her a defendant, Sims responded that although Del Santo was not present at the December 20 incident, she had been included because Sims had told her prior to the incident that he "had been threatened by two of these officers on a regular basis." (Id. at 30.) The AAG

questioned Sims about that conversation:

> Q.   How did you make your complaint to Del Santo, the nurse?
>
> A.   She got to be the mental health therapist that made rounds at SHU.  And being that I see inmates from MHU [Mental Health Unit], I see them on a regular basis from a lot of stress and things of that nature, I explained to her during her rounds and a few times when I've gone upstairs to PHU [sic] I explained to her I had to get away from down there because I stand by ready to lose it.  They keep constantly threatening me, and I'm not going to sit back and let them do it to me first, so before it happens I think I have--need a break.  Put me up here from downstairs, let things calm down.  On one occasion I told her that these guys was threatening me.  Her response was:  Well, you must have done something to them.  Okay.
>
> Q.   How many times did you complain to her?
>
> A.   I complained to her more than five times. How many exactly, I can't recall.  But I know it was definitely more than five times.

(Sims Dep. 32-33.)

Sims stated that he complained to Del Santo that the threatened assaults were "stressing [him] out" (id. at 62), but that nothing was ever done about those complaints.  The AAG  asked:

> Q.   Well, what did you expect Del Santo to do?
>
> A.   Like I said, that's my therapist, and being that I constantly complain to her she could go to the Superintendent and explain to them:  Listen, you know, the guy's one of our patients.  You know, he's down there in your area.  Do something about this before it gets out of hand.  You know, she has my whole folder right there.  She knows how I can get. Why allow it to escalate to that?
>
> Q.   Did you ask her to talk to the superintendent?
>
> A.   I asked her to speak to a few people.  I said:  Talk to whoever you've got to talk to to get them to stop bothering me, or get me out of here.

-8-

. . . .

Q. How could she get you out of there?

A. Like I said, put me--you know, they doing the same thing here now, mental health may go to the deputy of security, or go to the Superintendent. Listen, it would be beneficial to get Sims out of here. He's wearing his welcome out, or something. Anything! She could sit there, you know, like for his state of mind it would be beneficial to get him out of here.

Q. So she would have had to put you on PSU status?

A. No, she wouldn't have to put me on PSU status, but being my therapist she could make-- basically speak for me.

(Sims Dep. 62-64.)

As to the injuries claimed by Sims, the AAG questioned him as follows:

Q. Did you receive any injuries?

A. Yeah.

Q. And what injuries did you receive?

A. That laceration for one, swelling of my back, had to get five sutures to--steri-strips to close that up.

(Id. at 52.) After Sims described having the blood washed out of his eye, from the laceration above it, and stated that he had been given pain medication for his back, the AAG inquired as to any further injuries and received a negative response:

Q. And besides these injuries did you receive any other injuries?

A. No.

(Id. at 53.)

After exploring Sims's filing of a grievance and an

administrative complaint about the December 20 incident, the AAG returned to the subject of injury:

> Q. Besides the physical injuries did you suffer any mental injuries as a result of this incident?
>
> A. I wouldn't say I suffered mental injuries as a result of this, but I do think about it continuously.
>
> Q. Any emotional effects?
>
> A. In fact, I dream about it.
>
> Q. Any emotional or psychological injuries as a result of this?
>
> A. Emotionally, yes.
>
> Q. What are those injuries?
>
> A. I have to sit here, and every time I see a knife in one of the officer's hands I have to actually restrain myself from reacting because I don't know if they'll be allowed to do this again. And it has an emotional toll on me. As I say, I had dreams about this. I'm just not used to being on the receiving end of it. I mean, I've spent almost twenty years of my life in prison and never been cut by a prisoner or anyone, and I've got to be cut by an officer. That doesn't sit too well with me.
>
> Q. Are you receiving any treatment for your emotional injuries?
>
> A. Not pertaining to this particular incident, no.

(Sims Dep. 55-56.)

In September 2001, the court granted summary judgment dismissing the complaint against Del Santo and two other defendants to whom, Sims testified, he had complained but who were not present at the December 20 incident.

-10-

## 2. The Motion for Production of Sims's Psychiatric Records

In October 2001, the court granted a renewed request by Sims for the assignment of counsel; it appointed Jeffrey B. Korn, Esq., _et al_. Shortly thereafter, the remaining defendants served on Sims a demand for production of, _inter alia_, "[a]ll psychiatric records of [Sims] since [Sims's] incarceration in 1993." (Defendants' Request for Documents, dated October 23, 2001, at 2.) The demand attached a document for Sims's signature to authorize the State's Office of Mental Health ("OMH") to release

> any and all records or documents of any kind in [OMH's] possession pertaining to Nathaniel Sims, including but not limited to all medical, psychological and psychiatric reports and records, hospitalization records, doctors' notes, nurses' notes, correspondence, x-rays, charts and diagrams, laboratory and pathological reports and tests, and documents of any kind concerning examination and analyses, surgical and non-surgical procedures, diagnosis and prognosis, history and statements, bills and charges.

(_Id_., Attachment.)

Sims, through his new attorneys, objected to the document request on the ground that the records requested were protected by the psychotherapist-patient privilege. The magistrate judge to whom the case was assigned for supervision of pretrial proceedings initially granted defendants' request, ruling as follows:

> The Defendants are entitled to production of the Plaintiff's psychiatric treatment records. Although courts differ as to whether the assertion of a "garden variety" emotional distress claim requires a waiver of the psychiatrist-patient privilege, the Plaintiff's claim that he has become frightened of all knives as a result of the Defendants' alleged misconduct is not, in my judgment, such a "garden variety" claim.

Magistrate Judge's Order dated January 2, 2002 ("First M.J. Order").

Sims's attorneys promptly moved for reconsideration of the magistrate judge's order, stating that Sims had not intended to place his mental or emotional state in issue, and stating, "we hereby withdraw any claim Mr. Sims may have asserted to recover for 'non-garden variety' emotional distress injuries, including 'Plaintiff's claim that he has become frightened of all knives as a result of the Defendants' alleged misconduct.'" (Letter from Jeffrey B. Korn to Magistrate Judge Frank Maas dated January 7, 2002 ("Korn Letter"), at 1 (quoting First M.J. Order).) The letter elaborated:

In Jaffee v. Redmond, the Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence". 518 U.S. 1 (1996). This privilege may be waived only where a party places his mental or emotional condition "at issue" by relying upon "the condition as an element of his claim or defense". 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 504.01 (2d ed. 1997). Here, however, Mr. Sims never intended to place his mental or emotional state "at issue", and that condition is not an element of his Section 1983 claim. Indeed, Defendants' sole basis for asserting otherwise is Mr. Sims's undefended deposition testimony, elicited by defense counsel when Mr. Sims was a pro se litigant. At his deposition, Mr. Sims testified truthfully--and unguardedly--as to the emotional ramifications of the incident that is the subject of this action. (See Sims Dep. at 55-56 (attached hereto as Exhibit 1).) But Mr. Sims did not plead in his complaint, or testify at his deposition, that he was seeking to recover for those emotional injuries--i.e., he did not put them at issue for purposes of this litigation. (See Complaint, filed Feb. 15, 2000 (attached hereto as Exhibit 2); Sims Dep. at 55-56.)

In order to clarify the issue, we hereby

withdraw any claim Mr. Sims may have asserted regarding "non-garden variety" emotional distress injuries. Mr. Sims will not offer any evidence or make any argument at trial about those injuries, and will not seek any recovery for them. In light of this representation, there is no longer any basis for a finding of waiver.

(Korn Letter at 1 (emphasis in original).)

After reviewing this request and the response from defense counsel, the magistrate judge reversed his previous ruling, stating:

To the extent that Mr. Sims intends to testify generally that he was upset _as a result of_ an assault, I consider his claim "garden variety" and not one which would warrant the broad disclosure sought by the defendants. If, on the other hand, he will seek to recover damages for some generalized fear that he had prior to the assault, the psychiatric records must be disclosed. Finally, the defendants do not need the psychiatric records to establish whether Mr. Sims was sent to the PSU for "security reasons." If that were the case, some evidence of it surely would exist outside his psychiatric file.

Magistrate Judge's Order dated January 10, 2002 ("Revised M.J. Order") (emphasis in original).

### 3. The Order That Sims's Psychiatric Records Be Disclosed

On February 4, 2002, all of the remaining defendants except Blot and Caraballo were dismissed from the action by stipulation. Blot and Caraballo appealed the Revised M.J. Order to the district judge, who requested further submissions as to the effect of Sims's attorneys' claim-withdrawal representations on the issue of waiver. In response, Sims's attorneys wrote:

[W]e do not intend to offer:

- fact or expert testimony about a psychological disorder;

- evidence concerning conversations between Mr. Sims and psychiatric personnel;

- evidence concerning Mr. Sims's housing in the psychiatric satellite unit;

- evidence that Mr. Sims made a fear of the Defendants known to mental health officials;

- evidence that Mr. Sims was placed behind plexiglass, punched the plexiglass and as a result was admitted to the psychiatric satellite unit;

- evidence that Mr. Sims was transferred to the psychiatric satellite unit after the incident or that he was transferred there for security rather than psychiatric reasons; or

- evidence that Mr. Sims's mental health status affects his behavior.

In light of those clarifications, it is clear that Mr. Sims does not seek to make his mental condition an issue at trial. Stated simply, Mr. Sims does not assert any claim or defense involving his mental condition, nor does he intend to offer any evidence concerning that condition. Rather, it is Defendants that seek to make Mr. Sims's mental health status an issue in this litigation in an attempt to obtain evidence to impeach his credibility at trial. However, as demonstrated in our letters dated January 22 and 25, 2002, that is insufficient to pierce Mr. Sims's psychiatrist-patient privilege. See Jaffee v. Redmond, 518 U.S. 1, 17 (1996).

(Letter from Jeffrey B. Korn and Antony L. Ryan to District Judge Loretta A. Preska dated February 11, 2002 ("Korn/Ryan Letter"), at 1.)

In an order dated February 15, 2002, the district judge reversed the magistrate judge's January 10 denial of defendants' request for production of Sims's psychiatric records. As set forth more fully in Part II.B.2. below, the district judge ruled that Sims's deposition testimony constituted a waiver of his

psychotherapist-patient privilege, and that

> [Sims] may not unring the bell. "Once he waives his
> privilege . . . , a witness may not withdraw his
> waiver to prevent matters which he has already gone
> into from being explored in greater detail."

District Court Order dated February 15, 2002 ("2002 Disclosure Order"), at 1 (quoting United States ex rel. Carthan v. Sheriff, 330 F.2d 100, 102 (2d Cir.), cert. denied, 379 U.S. 929 (1964)). The district judge found that Sims had "testified freely as to communications with mental health professionals and as to the supposed circumstances of his placement in the PSU"; that he did so "in an effort to support his claim and otherwise gain advantage in this litigation"; and that "fairness requires that" Blot and Caraballo "have access to plaintiff's mental health records for the period from two years before the incident at issue through the present" because otherwise Blot and Caraballo would be "disadvantaged both specifically in their inability to, for example, prove . . . that [Sims] was not [sic] placed in the PSU for psychiatric reasons and generally in not being able to test [Sims's] credibility." 2002 Disclosure Order at 2.

### 4. The Dismissal for Lack of Exhaustion

Sims filed a petition in this Court for a writ of mandamus, seeking reversal of the 2002 Disclosure Order. Before that petition could be heard, Blot and Caraballo moved in the district court for summary judgment dismissing Sims's action on the

ground that he had failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). We held Sims's mandamus petition in abeyance pending resolution of the motion to dismiss his action, and that petition eventually became moot.

In August 2003, the district court dismissed the action, without prejudice to renewal after proper exhaustion of all available administrative remedies.

B. The Present Action

In 2004, Sims filed the present § 1983 action, represented by his appointed counsel, against Blot and Caraballo based on the same allegations as in the original action. Sims's complaint, as amended in May 2005 following complete exhaustion of his administrative remedies ("Amended Complaint"), alleges that Blot and Caraballo used excessive force against Sims in violation of his rights under the Eighth Amendment, by assaulting him "without provocation" (Amended Complaint ¶ 14), "intentionally and without justification" (id. ¶ 57). The Amended Complaint alleges that, as a result of respondents' cruel and unusual punishment, Sims "suffered serious and painful physical injuries, which required emergency medical attention." (Id. ¶ 58.)

Blot and Caraballo asked the district court to renew the 2002 Disclosure Order, entered in the original action, requiring Sims to disclose his mental health records. Blot and Caraballo maintained that Sims's complaint and deposition testimony waived his psychotherapist-patient privilege. They contended that

-16-

the application of the privilege will deny defendants _information vital to their defense_. Specifically, defendants contend that [Sims], who has been under the care of the Office of Mental Health for years, _did not ever express any fear of the defendants_, but rather suffers from a mental illness which may affect his perception. _Significantly, [Sims's] medical records reveal that in the past he has been suicidal and threatening, and has engaged in self-harm_.

(Letter from AAG Rebecca Ann Durden to District Judge Loretta A. Preska dated June 23, 2005, at 2 (emphases added).) Blot and Caraballo also argued that disclosure should be ordered on the grounds that "the mental health records" were needed to allow defendants to rebut Sims's testimony that he was returned to the PSU "because he was told that officers could not keep him safe from the defendants" (id. at 3), and that "[t]o the extent that [Sims] intends to argue at trial that he was not the aggressor, defendants should be permitted to provide the jury with evidence as to his state of mind at the time of, before and after the incident" (id. at 5). In response, Sims reiterated his prior representation that he would not offer any evidence at trial with respect to his mental state.

Respondents' motion for renewal of the 2002 Disclosure Order was argued at an unrecorded conference with the district judge on October 28, 2005. Both sides' briefs on appeal provide (without contradiction from the other side) some insight into what transpired at that conference. By the time of the conference, respondents had taken the deposition of an expert forensic pathologist who had been retained by Sims--apparently the only expert he retained--to give an opinion as to Sims's physical condition before and immediately after

the altercation.

> [A]t the October 28, 2005 oral argument, Respondents argued for a waiver based on Sims's pleadings and testimony, as well as the testimony of his expert that Sims's "memory of pain" and emotional state at the time affect the expert's opinion that Sims was unlikely (but not unable) to have started the altercation.

(Respondents' brief on appeal at 4 (emphasis in original).) The district judge indicated that she would grant respondents' motion, stating that Sims "had placed his psychiatric history at issue by relying on evidence that he suffered from a pre-existing physical condition to support his claim that he was attacked by Officer Blot." (Sims brief on appeal at 15 (emphasis in original).) The court explained that Sims had forfeited his psychotherapist-patient privilege by claiming that the attack on him was unprovoked, since Sims's "psychiatric records might show that he had masochistic or suicidal tendencies undermining his claim." (Id.)

In a brief order dated February 2006, without issuing a new written explanation, the district court granted respondents' motion for renewal of the 2002 Disclosure Order, stating as follows:

> IT IS HEREBY ORDERED that the New York State Office of Mental Health release to Rebecca Ann Durden, Assistant Attorney General, or her designated representative, . . . the complete mental health record for Nathaniel Sims . . . for the period December 20, 1997 to and including January 20, 2000.

District Court Order dated February 1, 2006 ("February 2006 Disclosure Order"). The present petition for mandamus followed.

## II.  DISCUSSION

-18-

In his petition for mandamus, Sims contends that the district court erred in ruling that he has waived his psychotherapist-patient privilege; he argues that he has not put his mental health in issue by alleging that corrections officers attacked him physically or by responding to questions in a deposition at which he was unable to be represented by counsel. Respondents contend (1) that the petition should be dismissed because the February 2006 Disclosure Order is an ordinary discovery order that does not involve "any recurring issue" (respondents' brief on appeal at 6) and hence is not reviewable by mandamus, and (2) that, in any event, the ruling that Sims has waived his privilege is correct because Sims put his mental state in issue by (a) alleging in his complaint that respondents assaulted him without provocation, (b) testifying at his deposition in a manner that, explicitly or implicitly, implicated his mental state at the time of the altercation and claimed emotional damage, and (c) retaining an expert to testify that it is unlikely that Sims would have been the aggressor in the altercation. Respondents also argue that any person seeking damages for injuries that include, or might include, pain and suffering waives the psychotherapist-patient privilege. For the reasons that follow, we conclude that mandamus is appropriate and that the disclosure order should be reversed.

A. Availability of Mandamus Review

The principles governing the availability of mandamus as an avenue for review of orders relating to pretrial discovery are

-19-

well established.

> Although mandamus is generally unavailable as a means of reviewing district court discovery orders, the writ is appropriate to review discovery orders that involve privilege where (i) the petition raises an issue of importance and of first impression; (ii) the petitioner's privilege will be lost if review must await final judgment; and (iii) immediate resolution will avoid the development of discovery practices or doctrine undermining the privilege.

In re Long Island Lighting Co., 129 F.3d 268, 270 (2d Cir. 1997) ("LILCO"); see, e.g., In re County of Erie, 473 F.3d 413, 416-17 (2d Cir. 2007). The first of these factors, although usually absent where the contention is merely that there was an "incorrect application of a well-developed principle," LILCO, 129 F.3d at 271 (discussing In re W.R. Grace & Co., 984 F.2d 587, 589 (2d Cir. 1993)), is present when the case instead involves "the extension of an established principle to an entirely new context," LILCO, 129 F.3d at 271 (discussing In re von Bulow, 828 F.2d 94, 97 (2d Cir. 1987)).

The second factor--loss of the petitioner's privilege if review must await final judgment--is normally present when the privilege is meant to protect the confidentiality of a communication (as contrasted, for example, with the privilege against self-incrimination), for "a remedy after final judgment cannot unsay the confidential information that has been revealed . . . ." In re von Bulow, 828 F.2d at 99; see, e.g., LILCO, 129 F.3d at 271. The third factor--the need to prevent the development of discovery practices that will undermine the privilege--is present where there is "potentially broad applicability and influence of the privilege

ruling under attack," LILCO, 129 F.3d at 271, thereby creating uncertainty as to whether a privileged communication will be protected. "An uncertain privilege--or one which purports to be certain, but results in widely varying applications by the courts-- is little better than no privilege." In re von Bulow, 828 F.2d at 100.

Sims's petition presents all of these factors. First, this Court has yet to address the issue of waiver or forfeiture in the context of the psychotherapist-patient privilege; nor have we addressed the degree to which a court should hold a pro se litigant, who is reluctantly proceeding without counsel, to have irretrievably waived that privilege in responding to questions at a deposition. Second, respondents do not dispute, and there is no question, that Sims's privilege of confidentiality will have been lost if review must await a final judgment, prior to which his communications to his psychotherapists are disclosed.

Finally, Sims's petition raises the novel and far-reaching question of whether a plaintiff's claim for injuries that include only the garden-variety emotional injury that would ordinarily result from a physical assault, constitutes a forfeiture of his psychotherapist-patient privilege. See Koch v. Cox, 489 F.3d 384, 390 (D.C. Cir. 2007) (distinguishing "garden variety" emotional distress from "any specific psychiatric injury or disorder, or unusually severe distress" (internal quotation marks omitted)). As discussed in Part II.B. below, the Supreme Court in Jaffee v. Redmond, 518 U.S. 1 (1996), made clear that "if the purpose of the

[psychotherapist-patient] privilege is to be served, the participants in the confidential conversation must be able to predict with some degree of certainty whether particular discussions will be protected," id. at 18 (internal quotation marks omitted). The rationales advanced by respondents in support of the district court's February 2006 Disclosure Order, if accepted, demonstrate that the confidentiality of psychotherapist-patient communications would be uncertain--if not extinguished--in a great number of cases.

For example, respondents contend that a plaintiff's allegation that an assault on him was unprovoked--or apparently even a nonspecific statement by the plaintiff or a witness "to the effect" that the assault was unprovoked--places the plaintiff's mental state in issue and forfeits his privilege. (Respondents' brief on appeal at 6 (emphasis added); see also id. at 20-22.) This rationale for disclosure could affect virtually every case in which an assault, or the use of excessive force, is alleged. Respondents also ask us to uphold the disclosure order on the theory that "anybody who asks for [damages for] pain and suffering has waived the psychiatric privilege[.]" (Transcript of oral argument of this appeal ("Oral Arg. Tr.") at 19-20.) They take the position that "if anybody asks for pain and suffering damages, [the defendants] are entitled to the[ plaintiff's] psychiatric records because the psychiatric records might conceivably disprove the experiencing of the pain and suffering[.]" (Id. at 19 (emphases added).) They further contend that a plaintiff places his mental health in issue by asserting a claim of "unspecified damages [that may] include[]

-22-

some sort of mental injury" (respondents' brief on appeal at 21 (emphasis added)), and that this Court "should find that even a claim of 'garden variety' injury waives the psychotherapist-patient privilege" (id. at 42; see also id. at 43 ("Whether the alleged injury is specific or general, unusual, or 'garden variety,' privilege is waived and the defendant is entitled to discovery about whether and to what extent the injury exists and about what, if anything, caused it.")). The breadth of respondents' proposed rationales is obvious.

Moreover, respondents argue that disclosure of Sims's mental health records is necessary so that the jury may have evidence as to "Sims's state of mind" in order to "evaluate whether [Sing Sing] staff members acted reasonably and in good faith" (respondents' brief on appeal at 21) (brackets in original) (internal quotation marks omitted) (emphases added). Leaving aside the mental gymnastics needed to justify the leap from the mental state of Sims to the mental state of respondents, it would appear that this proposed justification for the forfeiture of a plaintiff's psychotherapist-patient privilege could be asserted whenever a defendant wished to interpose a defense of good faith.

In sum, despite respondents' suggestion that the present petition "will not resolve any recurring issue" (respondents' brief on appeal at 6), their own contentions are of such breadth as to make it clear that immediate review is needed in order to prevent a proliferation of discovery rulings that could eviscerate the effectiveness of the psychotherapist-patient privilege. We conclude

-23-

that mandamus review is appropriate.

B.    The Psychotherapist-Patient Privilege

In 1996, the Supreme Court made clear that the federal courts are required to recognize that confidential communications between a licensed psychotherapist--including a licensed social worker engaged in psychotherapy--and his or her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence, see Jaffee, 518 U.S. at 15. The Court noted that "[t]he psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." Id. at 11. The Court concluded that the privilege thus "promotes sufficiently important interests to outweigh the need for probative evidence," id. at 9-10 (internal quotation marks omitted), i.e., that it "serve[s] a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth," id. at 15 (internal quotation marks omitted).

The Court reasoned that strict confidentiality is required because

> [l]ike the spousal and attorney-client privileges, the psychotherapist-patient privilege is rooted in the imperative need for confidence and trust. . . . Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for

-24-

which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

Id. at 10 (internal quotation marks omitted) (emphases added). The Court observed that psychiatrists' ability to help their patients

is completely dependent upon [the patients'] willingness and ability to talk freely. This makes it difficult if not impossible for [a psychiatrist] to function without being able to assure . . . patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . . . , there is wide agreement that confidentiality is a sine qua non for successful psychiatric treatment.

Id. (internal quotation marks omitted).

Further, as confidentiality is a sine qua non, the Jaffee Court refused to endorse the proposition that a court could subject a claim of psychotherapist-patient privilege to a balancing test, see id. at 17, and deny protection if it found "in the interests of justice, [that] the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests," id. at 7 (internal quotation marks omitted). Rejecting such a "balancing component of the privilege," the Supreme Court stated that

[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. . . . [I]f the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain

-25-

privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

*Id.* at 17-18 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)) (emphasis added).

### 1. Waiver and Forfeiture Principles

Despite ruling that the psychotherapist-patient privilege should be accorded strict protection, the *Jaffee* Court noted that "[l]ike other testimonial privileges, the patient may of course waive the protection." 518 U.S. at 15 n.14. Waiver of a privilege may be either express or implied, *see, e.g.*, *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) ("*Doe Co.*"), and a district court's finding that a party has waived a privilege is reviewed under the abuse-of-discretion standard, *see, e.g.*, *In re von Bulow*, 828 F.2d at 101. A district court has "abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), or rendered a decision that "cannot be located within the range of permissible decisions," *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

In dealing with testimonial privileges other than the psychotherapist-patient privilege, we have held that a waiver may be implied in circumstances where it is called for in the interests of fairness. "[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.'" *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("*In re Grand*

Jury") (quoting United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.) ("Bilzerian"), cert. denied, 502 U.S. 813 (1991), and In re von Bulow, 828 F.2d at 103).  "The quintessential example is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his [attorney-client] privilege with respect to the advice that he received."  In re Grand Jury, 219 F.3d at 182-83 (internal quotation marks omitted).  Or the holder of the privilege may "assert[] a claim that in fairness requires examination of protected communications."  Bilzerian, 926 F.2d at 1292; see also United States v. Nobles, 422 U.S. 225, 239-40 (1975) (litigant may not both present the trial testimony of an investigator as to statements he obtained from witnesses and refuse, on the ground of work-product privilege, to produce relevant portions of the investigator's report for use in cross-examining him).  "In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."  In re Grand Jury, 219 F.3d at 182 (emphasis added).

"'[W]hether fairness requires disclosure . . . is best decided on a case by case basis, and depends primarily on the specific context in which the privilege is asserted.'"  Doe Co., 350 F.3d at 302 (quoting In re Grand Jury, 219 F.3d at 183).  For example, we look to see whether the privilege holder took "affirmative steps to inject privileged materials into the litigation."  Id. at 187.  In addition, the venue of the privilege

-27-

holder's statements may be material, for the fairness inquiry focuses on whether there is a "risk that some independent decisionmaker will accept [the privilege-holder's] representations without the [adversary's] having adequate opportunity to rebut them." Doe Co., 350 F.3d at 305. Thus, a defendant may forfeit his attorney-client privilege with respect to certain materials "if [he gives] certain testimony at trial before the jury," id. at 304 n.3 (emphasis in original) (discussing Nobles and Bilzerian); but he does not forfeit it merely by asserting to his adversary that he believes he has done nothing wrong, see, e.g., id. at 304; see also id. at 302 (noting that where the holder made no representation, express or implied, that he intended to surrender his privilege, the applicable principle is perhaps more aptly termed "one of forfeiture, rather than waiver"). The Supreme Court has noted that "[p]arties may forfeit a privilege by exposing privileged evidence, but do not forfeit one merely by taking a position that the evidence might contradict." United States v. Salerno, 505 U.S. 317, 323 (1992).

A further consideration in the fairness analysis is whether the witness's testimony was given in the absence of counsel. Thus, in In re Grand Jury, 219 F.3d at 186-87, we held that a corporation's privilege was not necessarily lost by reason of the grand jury testimony of a witness--the corporation's founder, chief executive officer, and controlling shareholder--who was uncounseled in the grand jury room and had no legal training.

We also note that in other contexts, a "party appearing

without counsel is afforded extra leeway in meeting the procedural rules governing litigation," and that district judges should "make some effort to protect a party so appearing from waiving a right . . . because of his or her lack of legal knowledge." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993). To give such "extra leeway," courts are, for example, to construe a pro se litigant's pleadings and motions liberally, see Haines v. Kerner, 404 U.S. 519, 520 (1972), and to allow amendments to a pro se litigant's pleadings more freely, see Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir. 1980); courts should not allow a pro se litigant's rights to "be impaired by harsh application of technical rules," Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983).

This Court has not previously addressed questions as to whether a plaintiff asserting a civil rights claim forfeits his psychotherapist-patient privilege by reason of allegations in his pleading or his answers to questions in discovery. We note that the District of Columbia Circuit, presented with precisely these questions in Koch v. Cox, 489 F.3d 384 (D.C. Cir. 2007) ("Koch"), has rejected broad claims of waiver.

In Koch, the plaintiff sued his employer, the Securities and Exchange Commission ("SEC"), for discrimination, retaliation, and failure to accommodate his medical conditions; the SEC sought to subpoena records and testimony from Koch's psychotherapist. A magistrate judge ordered production, ruling that Koch had forfeited his psychotherapist-privilege because (1) he had made a claim for emotional distress damages, and (2) he had stated in answers to

interrogatories that he suffered from depression and took medication for that condition. Koch moved in the district court to withdraw any claim for emotional distress damages, and he argued to the court of appeals that in fact his "complaint d[id] not even contain a claim of emotional distress." 489 F.3d at 388. The court of appeals, on reviewing the complaint, found that Koch indeed had made no such claim in his complaint. And it found that his interrogatory answers as to depression "d[id] not clearly make an allegation of, much less a claim to recovery for, emotional distress." Id. In addition, the Koch Court found it "clear" that Koch had "abandoned any claim the district court may have thought he made for damages due to emotional stress." Id. Accordingly, the only question before the court of appeals was whether a plaintiff--who had in fact made no claim for emotional distress and had expressly abandoned any such claim--had nevertheless irrevocably "put[] his mental state in issue in such a way as to waive the psychotherapist-patient privilege by acknowledging he suffer[ed] from depression." Id.

Analogizing to other testimonial privileges, "consistent with the Supreme Court's analogy in Jaffee," the Koch Court stated that although a plaintiff waives his psychotherapist-patient privilege if he "does the sort of thing that would waive the attorney-client privilege, such as basing his claim upon the psychotherapist's communications with him," id. at 391, or "selectively disclos[ing] part of a privileged communication in order to gain an advantage in litigation," id. (internal quotation marks omitted), or "su[ing] the therapist for malpractice," id. at

-30-

389, he "does not put his mental state in issue merely by acknowledging he suffers from depression, for which he is not seeking recompense," id. at 391 (emphasis added). The Koch Court also ruled that the privilege is not overcome when the plaintiff's mental state is put in issue only by the defendant. See id.; see also id. at 390-91 (plaintiff's waiver of the privilege as to a different doctor with respect to physical ailments did not put his mental condition in issue or waive his psychotherapist-patient privilege). The Koch Court rejected the SEC's contention that "any time it is possible, as a matter of medical science, that a plaintiff's mental condition--depression, anxiety, remorse, etc.-- may be a cause of his alleged physical condition, or even just aggravate that condition, the plaintiff necessarily has put his mental state in issue and thereby waived the psychotherapist-patient privilege," stating that such a rule would "eviscerate the privilege." Id. 389-90.

The Koch decision is consistent with the considerations leading to our own decisions discussed above. In light of the transcendent importance of the psychotherapist-patient privilege as discussed in Jaffee, we agree with the Koch Court that a plaintiff does not forfeit his psychotherapist-patient privilege merely by asserting a claim for injuries that do not include emotional damage; that a plaintiff does not forfeit that privilege by merely stating that he suffers from a condition such as depression or anxiety for which he does not seek damages; that a plaintiff may withdraw or formally abandon all claims for emotional distress in order to avoid

forfeiting his psychotherapist-patient privilege; and that a party's psychotherapist-patient privilege is not overcome when his mental state is put in issue only by a another party.

2. Application of Forfeiture Principles to Sims's Claim

The running themes in respondents' request for Sims's psychiatric records are their contentions (1) that "Sims's complaint, his deposition testimony, and the deposition testimony of his hired expert, [are] all to the effect that . . . he had suffered serious emotional damages as a result of the assault" (respondents' brief on appeal at 6 (emphasis added); see, e.g., id. at 3, 28-29); (2) that even a request for only garden-variety damages waives the psychotherapist-patient privilege "because the psychiatric records might conceivably disprove the experiencing of the pain and suffering" (Oral Arg. Tr. 19 (emphasis added); see also respondents' brief on appeal at 42-43); and (3) that Sims's psychiatric records may be used to show that Sims, rather than Blot, started the December 20 altercation, i.e., that "Sims's mental state is and always has been at the heart of this case" (respondents' brief on appeal at 11) in which "[t]he principal issue at trial will be whether Sims first physically attacked officer Blot or vice-versa" (respondents' letter brief on appeal, dated February 15, 2008, at 1).

The district court appears to have accepted these arguments. The February 2006 Disclosure Order that granted respondents' motion for a renewal of the 2002 Disclosure Order was

not accompanied by a new written explanation, and we assume that the district judge's reasons for granting disclosure were those she expressed in the 2002 Disclosure Order, as well as those she is described by the parties as having stated at the unrecorded October 28, 2005 oral argument of the renewal motion. In ordering disclosure in 2002, the district judge stated, in pertinent part, as follows:

> [P]laintiff argues that his withdrawal of his non-garden variety claims for emotional damages and his undertaking not to testify to his fear of defendants or that he was placed in the PSU for security reasons makes contrary material in his mental health records inadmissible. That information may be inadmissible at trial, however, does not preclude its discovery. Fed. R. Civ. P. 26(b)(1). More importantly, however, plaintiff may not unring the bell. "Once he waives his privilege . . . , a witness may not withdraw his waiver to prevent matters which he has already gone into from being explored in greater detail." United States [ex rel. Carthan] v. Sheriff, 330 F.2d 100, 102 (2d Cir. 1964) (citing Brown v. United States, 356 U.S. 148 (1958)). . . .

> Here, plaintiff testified freely as to communications with mental health professionals and as to the supposed circumstances of his placement in the PSU in an effort to support his claim and otherwise gain advantage in this litigation. Defendants, on the other hand, are disadvantaged both specifically in their inability to, for example, prove the negative that plaintiff was not [sic] placed in the PSU for psychiatric reasons and generally in not being able to test plaintiff's credibility based on what is apparently not an insubstantial mental health issue. See Chnapkova v. Koh, 985 F.2d 79, 82 (2d Cir. 1993). Accordingly, fairness requires that defendants have access to plaintiff's mental health records for the period from two years before the incident at issue through the present.

2002 Disclosure Order at 1-2 (emphases added). And at the October 2005 oral argument of the renewal motion, the district judge

-33-

apparently indicated that Sims had forfeited his psychotherapist-patient privilege for the additional reasons (a) that he "had placed his psychiatric history at issue by relying on evidence that he suffered from a pre-existing physical condition to support his claim that he was attacked by Officer Blot," and (b) that Sims claimed that Blot's attack on him was unprovoked, which might be undermined because Sims's "psychiatric records might show that he had masochistic or suicidal tendencies." (Sims brief on appeal at 15 (emphasis in original).)

We note first that the record in no way justifies acceptance of respondents' contentions that Sims's complaint, his deposition testimony, and the deposition testimony of his expert witness assert that Sims "suffered serious emotional damages as a result of the assault" (respondents' brief on appeal at 6). The original complaint filed by Sims, described in Part I.A. above, describes as his injuries only shoulder pain and a laceration over his eye; Sims's current complaint alleges that Sims "suffered serious and painful physical injuries, which required emergency medical attention" (Amended Complaint ¶ 58 (emphasis added)); but neither complaint so much as mentions emotional injury. Nor do we see that Sims suggested that he was asserting a claim for emotional injury, serious or otherwise, in his deposition testimony. As quoted in Part I.A.1. above, Sims testified that he thinks and dreams about the assault and that he becomes anxious at the sight of a corrections officer holding a knife. But he testified, "I wouldn't say I suffered mental injuries as a result of this" (Sims

Dep. 55); he testified that he was not receiving any treatment for emotional injury related to the events underlying this litigation (see id. at 55-56); and nowhere did he state that he was seeking damages for mental or emotional injuries. Finally, as to Sims's expert's deposition, respondents have provided us with no page citation to support their contention that his testimony includes the opinion that Sims suffered serious emotional damages as a result of the assault; and in our own review of that deposition, we have seen no testimony as to any emotional consequences at all, much less as to any "serious" emotional injury.

In addition, for the reasons that follow, we conclude that the district court's 2002 Disclosure Order and the rationales stated at the 2005 oral argument of the renewal motion were based on erroneous views of the law and did not properly apply the privilege-forfeiture principles discussed in Part II.B.1. above.

a. The Legal Framework of the District Court's Ruling

In reaching its conclusion that Sims's mental health records should be disclosed because Sims "may not unring the bell," 2002 Disclosure Order at 1, the court quoted United States ex rel. Carthan v. Sheriff ("Carthan") for the proposition that "[o]nce he waives his privilege . . . , a witness may not withdraw his waiver to prevent matters which he has already gone into from being explored in greater detail," 330 F.2d at 102 (emphasis ours). The context in which the Carthan statement was made, however, was materially different from the circumstances here.

-35-

To begin with, Carthan was not a plaintiff in a civil case in which he could withdraw a claim; he was a witness in a grand jury investigation over which he had no control. Further, he was a New York City employee who was required, by the City Charter, "to waive his privilege against self-incrimination with respect to city affairs" if he wished to retain his position and his eligibility for any other city employment; and he in fact "executed a Limited Waiver of Immunity." 330 F.2d at 101. In addition, Carthan had proceeded to disclose financial information for certain years by answering grand jury questionnaires. When he thereafter, invoking the privilege against self-incrimination, resisted compliance with a grand jury subpoena for his income tax returns for those years and was held in contempt, we refused to disturb the contempt ruling because he had knowingly waived his privilege. This was the context of the statement that Carthan could not "withdraw his waiver," id. at 102.

The circumstances of the present case are far different. For example, nothing in the record here suggests that Sims made a knowing election to waive his psychotherapist-patient privilege. Sims requested and was denied assignment of counsel, and nothing has been called to our attention to indicate that he was even aware that he had such a privilege and was entitled to maintain the confidentiality of his psychiatric communications.

Further, unlike a grand jury witness who has no say over the issues in the proceeding, Sims, as a plaintiff in a civil case, was entitled not to pursue a claim he had asserted. Indeed, Sims's

attorneys stated that "Sims never intended to place his mental or emotional state 'at issue', and that condition is not an element of his Section 1983 claim." (Korn Letter at 1.) And as discussed above, there is in fact no mention in either Sims's original complaint or his Amended Complaint of emotional distress. But in any event, especially given that Sims commenced the action pro se, his subsequent counseled express disavowal of any claim for unusual emotional distress--whether such a claim was actually asserted or was merely imputed to him by respondents--should have been given effect.

Finally as to Carthan, as discussed in Part II.B.2.c. below, a disclosure made to the grand jury is materially different in impact from a disclosure made to a party opponent in a deposition. A grand jury uses the information it receives in order to decide whether or not a criminal proceeding will be commenced. Deposition testimony in a civil action, on the other hand, might never come to the attention of any decisionmaker. For all of these reasons, Carthan's ruling that the grand jury witness could not withdraw his waiver of the privilege against self-incrimination bears little relationship to this civil-action plaintiff's withdrawal of a claim.

In addition, the district court in the present case cited Chnapkova v. Koh, 985 F.2d 79, 82 (2d Cir. 1993), in support of its view that Sims's psychiatric records should be disclosed in order to avoid respondents' being "disadvantaged . . . specifically in their inability to, for example, prove" the reason for Sims's return to

-37-

the PSU, and "disadvantaged . . . generally" if they are unable to use those records "to test [his] credibility," 2002 Disclosure Order at 2. Chnapkova, however, which concerned admissibility of a plaintiff's psychiatric records at trial, did not analyze--or even mention--privilege and did not involve an issue of privilege waiver or forfeiture. Rather, its focus was solely on the probative value of the records. The trial in Chnapkova took place prior to this Court's first recognition of the psychotherapist-patient privilege, see In re Doe (Diamond), 964 F.2d 1325, 1328 (2d Cir. 1992), and the Chnapkova trial judge excluded the plaintiff's psychiatric records from evidence pursuant to Fed. R. Evid. 403 on the ground that any probative value they might have was outweighed by the danger of unfair prejudice. This Court reversed, holding that the records could be used because they would be sufficiently "probative of . . . credibility," id. at 81, and "certainly probative" of one of the facts in issue, see id. at 82. Our conclusion in Chnapkova, which was decided in 1993, that the prejudice resulting from disclosure of psychiatric records could be outweighed by the probative value of those records, was overtaken by the Supreme Court's 1996 decision in Jaffee that the psychotherapist-patient privilege is not subject to such a balancing test. As discussed above, Jaffee held that the psychotherapist-patient privilege "promotes sufficiently important interests to outweigh the need for probative evidence," 518 U.S. at 9-10 (internal quotation marks omitted), and "transcend[s] the normally predominant principle of utilizing all rational means for ascertaining truth," id. at 15 (internal quotation marks omitted).

In sum, the district court's reliance on Chnapkova in the 2002 Disclosure Order for the proposition that Sims's psychiatric records should be disclosed in order to allow respondents to prove certain facts and to test Sims's credibility was misplaced, as that case did not involve a claimed privilege forfeiture or entail the type of fairness analysis that a determination as to forfeiture requires, and instead utilized a balancing analysis that is now foreclosed by Jaffee.

Nor does the district court's decision comport with Jaffee based on the rationale stated in October 2005 that Sims's psychiatric records should be disclosed, on account of his assertion that the assault on him was unprovoked, because those records might undermine that assertion by showing that he had masochistic or suicidal tendencies. The possibility that a patient has such tendencies is a far better reason to deny disclosure than to grant it. "If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled," Jaffee, 518 U.S. at 11-12, and the public interest in securing psychiatric help for a patient who has suicidal tendencies surely transcends the interest of an accused assailant who wishes to suggest that the existence of such tendencies indicates that the patient started the fight. The "suicidal tendencies" rationale exceeded appropriate bounds of discretion.

Finally, while the district court recognized the importance of fairness to the other side in considering whether there should be a forfeiture of the privilege, we do not see that

the court gave consideration to several components of fairness in this context, which are discussed in Part II.B.1. Sims, who had expressly withdrawn any claim of emotional distress injury (beyond "garden variety" pain and suffering from physical injury) had not attempted to "use the privilege both as 'a shield and a sword.'" In re Grand Jury, 219 F.3d at 182. This case had nothing in common with that of a "defendant who asserts an advice-of-counsel defense" but then invokes the privilege in an effort to prevent the adversary from discovering his communications with his counsel. Id. at 182-83 (internal quotation marks omitted). Nor was Sims "assert[ing] a claim that in fairness requires examination of protected communications." Bilzerian, 926 F.2d at 1292. Sims was not "partially disclos[ing] privileged communications or affirmatively rely[ing] on privileged communications to support [his] claim . . . and then shield[ing] the underlying communications from scrutiny by the opposing party." In re Grand Jury, 219 F.3d at 182. He did not take "affirmative steps to inject privileged materials into the litigation" while simultaneously trying to shield the privileged communications from scrutiny by the adversary. Id. at 187. "The unfairness courts have found which justified imposing involuntary forfeiture [of a privilege] generally resulted from a party's advancing a claim to a court or jury (or perhaps another type of decision maker) while relying on its privilege to withhold from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim." Doe Co., 350 F.3d at 303. This case exhibited none of these characteristics.

Further, in basing its waiver finding on the proposition that at his deposition Sims "testified freely," 2002 Disclosure Order at 2, about his communications with Del Santo, the district court apparently gave no consideration to the fact that at that deposition Sims was not represented by counsel, the court having denied his request either for permission to provide discovery in some other manner or for the appointment of counsel to represent him. While a party to a civil action of course has no constitutional right to the assignment of counsel, see, e.g., United States v. Coven, 662 F.2d 162, 176 (2d Cir. 1981), cert. denied, 456 U.S. 916 (1982), and we intend no criticism of the district court for not having appointed counsel for Sims sooner, it is nonetheless relevant to the fairness analysis that the record does not indicate that Sims was learned in the law and does indicate that when Sims represented himself at his deposition it was not by his choice.

### b. The View that Sims Used His Privilege as a Sword

Further, we cannot accept the district court's finding that fairness required the disclosure of Sims's psychiatric records on the basis that his testimony (a) as to his "communications with mental health professionals and [b] as to the supposed circumstances of his placement in the PSU" constituted "an effort to support his claim and otherwise gain advantage in this litigation," 2002 Disclosure Order at 2. The finding with respect to Sims's communications with mental health professionals would have been an appropriate rationale for disclosure to Del Santo, the psychiatric

nurse, if she were still a defendant in this action. Sims testified that the reason he had sued Del Santo, who was not present at the December 20 incident, was that he had told her he was repeatedly threatened by two of the corrections officers and had asked her to intercede with prison officials on his behalf (see Sims Dep. 62-64), but that nothing had been done about his complaints. If the lack of any curative response to those complaints were the basis of an existing claim by Sims against Del Santo, Sims could properly have been found to be using his confidential communications as a sword and be prohibited from using his privilege as a shield.

But Del Santo was dismissed from this action in September 2001, prior to the defense request for Sims's psychiatric records, and there were--and are--no assertions of this type with respect to Blot and Caraballo. Further, Sims has represented that he will offer no evidence at trial that he fears corrections officers or that he ever communicated any fear of Blot and Caraballo to mental health officials.

As to the finding that Sims sought to support his claim and gain a litigation advantage by testifying "as to the supposed circumstances of his placement in the PSU," it is not clear whether the district court was referring to his placement in the PSU before or after the December 20 incident, but it is difficult to see how either placement supports--or refutes--Sims's claim so as to provide a permissible rationale for disclosure of his mental health records. The pre-altercation theory advanced by respondents, i.e., the contention that Sims forfeited his psychotherapist-patient privilege

-42-

by alleging in his original complaint that the altercation occurred while he was on his way to SHU from the PSU, is baseless. There is no dispute as to where the altercation occurred; there is no dispute as to where Sims was coming from when the altercation occurred; and the place from which Sims was coming sheds no light on any factual issue to be tried in this case.

Similarly, to the extent that the district court instead meant that respondents would be disadvantaged if they could not use Sims's mental health records to show that Sims was returned to the PSU for mental health reasons, rather than for security reasons, on the day after the altercation, the court did not explain how the reason for his return to the PSU would shed any light on who had started the fight; and we see no connection. In any event, the circumstances of Sims's return to the PSU after the altercation had been withdrawn from the case by Sims's attorneys' representations in 2002 (see Korn/Ryan Letter at 1 ("we do not intend to offer . . . evidence that Mr. Sims was transferred to the psychiatric satellite unit after the incident or that he was transferred there for security rather than psychiatric reasons")).

Nor does the deposition testimony of Sims's forensic pathologist, Isidore Mihalakis, M.D., to which the court apparently referred at the October 2005 oral argument of respondents' motion to renew the 2002 Disclosure Order, provide a proper basis for finding that Sims forfeited his psychotherapist-patient privilege. At that deposition, Mihalakis gave his opinion that it was unlikely that Sims was the aggressor in the December 20 incident (by moving in a

sudden and violent manner as apparently described in a deposition given by Blot) because Sims had a "memory of pain," associated with such a movement, from a preexisting physical condition. (Deposition of Isidore Mihalakis, M.D., October 4, 2005, at 40.) This testimony does not justify a forfeiture of Sims's psychotherapist-patient privilege for several reasons. First, Mihalakis's opinion concerned the effects of a chronic condition that was not psychological but physical. Second, Mihalakis is not a psychiatrist or a psychologist; he would not be qualified to testify at trial as to Sims's mental state. And third, Sims's attorneys had represented that they would not offer at trial evidence that Sims's mental health status affects his behavior. (See Korn/Ryan Letter at 1.) In addition, clarifying that representation in response to this Court's request at oral argument, Sims's attorneys have stated that Mihalakis did not review any of Sims's mental health records, and that Sims "will not offer any testimony from Dr. Mihalakis concerning the effect of Mr. Sims' emotional state or 'memories of pain' on his actions" (Sims letter brief on appeal, dated February 8, 2008, at 1). Given this record, the prospective testimony of the pathologist provides no basis for finding that fairness demands disclosure of Sims's psychiatric records to respondents.

In sum, we conclude that with respect to Sims's claims against Blot and Caraballo, who are the only remaining defendants, the district court erred in indicating that Sims essentially used his privilege as a sword.

### c. The Disregard of Both the Procedural Context of Sims's Statements and His Evidentiary and Claim Renunciations

Finally, in finding that fairness required that respondents be given access to Sims's mental health records, the district court noted, but plainly gave no effect to, Sims's attorneys' representations that Sims's mental or emotional state "is not an element of his Section 1983 claim" (Korn Letter at 1) or their representations, described in Parts I.A.2. and I.A.3. above, that they would not offer evidence relating to his mental or emotional state. While the court initially adverted to the claim withdrawal and evidentiary renunciations, it did so only to state that although they might make the information inadmissible at trial, admissibility was not the test. See 2002 Disclosure Order at 1. The court thereafter proceeded to assess the fairness issue, however, as if the renounced evidence would in fact be admitted, concluding, for example, as discussed above, that respondents would be at a disadvantage because they would be unable to prove that Sims was returned to the PSU after the December 20 incident for reasons other than security. See id. at 2. But with no evidence to be presented by Sims at trial as to this matter, the view that respondents would be unfairly prejudiced by lacking access to the privileged information that might "prove the negative," id., is inexplicable.

These findings that respondents would be disadvantaged by Sims's references to his privileged communications and his return to the PSU--and the ruling that Sims cannot "unring the bell"--ignored the procedural venue in which his statements were made. As

discussed in Part II.B.1. above, the fairness inquiry focuses on whether there is a risk that a "decisionmaker" will accept the privilege-holder's statements without his opponent's having an adequate opportunity to present rebutting evidence. See, e.g., Doe Co., 350 F.3d at 305. In Carthan, for example, statements were made to the grand jury, which was to decide whether, and against whom, to return an indictment; the witness was not allowed to waive his privilege against self-incrimination in order to make certain statements, but then invoke the privilege to deny the grand jury access to materials that would allow it to evaluate those statements.

In the present case, in contrast, Sims's statements were made only in a deposition, not before a decisionmaker or factfinder. Given that Sims cannot introduce any of his own deposition testimony at trial (unless, of course, respondents were to introduce some portion of the deposition that Sims should be allowed to supplement in the interest of completeness, see Fed. R. Civ. P. 32(a)(6)), Sims's deposition testimony does not place respondents in a disadvantageous position at trial. And since Sims made it clear that he will not offer any evidence as to his mental health, or any psychological disorder, or his fears, or any non-garden-variety emotional distress resulting from the alleged assault, etc., we conclude that it was not within the permissible limits of discretion for the district court to conclude that respondents would be prejudiced if Sims were not required to disclose his mental health records.

### d.   Respondents' Alternative Arguments

The suggestions advanced by respondents as alternative bases for upholding the order for disclosure of Sims's mental health records fare no better.  Their contention that "Sims's allegation of the improper use of force raises the question of whether Sims, **due to uncontrolled aggression, a persecution complex, or some other psychological problem,** started the fight by attacking the correction officers, in which case the Respondents would not be liable" (respondents' brief on appeal at 21-22 (emphases added)), provides no basis for disclosure of Sims's psychiatric records.  If Sims started the fight by attacking respondents, respondents presumably would not be liable for the injuries alleged here regardless of whether or not Sims was motivated by such a mental condition.

Further, a privilege may be forfeited with respect to a "claim or defense," In re Grand Jury, 219 F.3d at 182 (emphasis added).  Thus, respondents' notion that a party forfeits his psychotherapist-patient privilege simply because he alleges--or even implies--that the attack on him was unprovoked is farther-reaching than perhaps respondents envision.  If that principle were adopted, it would also be applicable to Blot and Caraballo, who contend that it was Sims who started the fight without provocation from them.  On respondents' theory, in any assault or excessive-force case both the plaintiffs and the defendants could be required to disclose their respective mental health records.  Disclosure, rather than protection of confidentiality, would become the norm.

Finally, we reject respondents' contentions that "anybody"

-47-

who requests damages for "pain and suffering has waived the psychiatric privilege" "because the psychiatric records might conceivably disprove the experiencing of the pain and suffering" (Oral Arg. Tr. 19), that any claim of "even . . . 'garden variety' injury waives the psychotherapist-patient privilege" (respondents' brief on appeal at 42), and that a plaintiff's mental health is placed in issue whenever the plaintiff's claim for "unspecified damages" may "include[] some sort of mental injury" (respondents' brief on appeal at 21). In reality respondents simply seek to have the privilege breached whenever there is a possibility that the psychiatric records may be useful in testing the plaintiff's credibility or may have some other probative value. To accept these contentions would inject the balancing component that Jaffee foreclosed, and would disregard the principle that "[p]arties . . . do not forfeit [a privilege] merely by taking a position that the evidence might contradict," Salerno, 505 U.S. at 323. If this principle were not the rule, then in virtually every case a forfeiture might be found, as in virtually every case the party opposing the privilege could argue that the psychological record might reveal evidence that the party asserting the privilege is testifying falsely.

CONCLUSION

We have considered all of respondents' arguments on this

-48-

appeal and have found them to be without merit. Given the considerations discussed above, including

> - the importance of the psychotherapist-patient privilege, and the Supreme Court's ruling in <u>Jaffee</u> that, if not waived, that privilege is to be upheld without being subjected to a balancing analysis in which the privilege may be deemed outweighed by the need for probative or impeaching evidence,

> - the district court's erroneous views that the cases it cited supported a determination that Sims's psychotherapist-patient privilege was forfeited, and

> - the district court's failure to consider such fairness factors as

>> - the absence of any allegation of emotional injury in Sims's pleadings,

>> - the fact that the only statements by Sims that he suffered any emotional distress were made in his deposition, at which he reluctantly appeared <u>pro se</u>,

>> - the fact that even after respondents brought up the subject of emotional injury and Sims testified that he suffered recurring dreams and anxiety, he did not assert any claim for recovery on that basis,

>> - the fact that no part of Sims's deposition testimony would be admitted in evidence at trial unless respondents' own submissions require it, and

>> - Sims's evidentiary renunciations and his withdrawal of any claim to damages for mental injury or any non-garden-variety emotional injury,

we conclude that the order requiring disclosure of Sims's mental health records to respondents was beyond the permissible limits of discretion.

The writ of mandamus is granted. The February 2006 Disclosure Order is reversed. We of course express no view as to the merits of the case.