11-320-cr
*United States v. Ghailani*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2012

————

No. 11-320-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

AHMED KHALFAN GHAILANI, a/k/a FUPI, a/k/a ABUBAKARY KHALFAN
AHMED GHALILIANI,
*Defendant-Appellant,*

WADIH EL HAGE, a/k/a ABDUS SABBUR, FAZUL ABDULLAH
MOHAMMED, a/k/a HARUN FAZHL, a/k/a FAZHL ABDULLAH, a/k/a
FAZHL KHAN, MOHAMED SADEEK ODEH, a/k/a ABU MOATH, a/k/a
NOURELDINE, a/k/a MARWAN, a/k/a HYDAR, MOHAMED RASHED
DAOUD AL-'OWHALI, a/k/a KHALID SALIM SALEH BIN RASHED, a/k/a
MOATH, a/k/a ABDUL JABBAR ALI ABEL-LATIF, USAMA BIN LADEN,
a/k/a USAMAH BIN-MUHAMMAD BIN-LADIN, a/k/a SHAYKH USAMAH
BIN-LADIN, a/k/a MUJAHID SHAYKH, a/k/a HAJJ, a/k/a QAQA, a/k/a THE
DIRECTOR, MUHAMMAD ATEF, a/k/a ABU HAFS, a/k/a ABU HAFS EL
MASRY, a/k/a ABU ABU HAFS EL MASRY E KHABIR, a/k/a TAYSIR, a/k/a
AHEIKH TAYSIR ABDULLAH, MUSTAFA MOHAMED FADHIL, a/k/a
MUSTAFA ALI ELBISHY, a/k/a HUSSEIN, a/k/a HASSAN ALI, KHALFAN
KHAMIS MOHAMED, a/k/a KHALFAN KHAMIS, SHEIKH AHMED SALIM

SWEDAN, a/k/a SHEIKH BAHAMADI, a/k/a AHMED ALLY, MAMDOUH
MAHMUD SALIM, a/k/a ABU HAJER AL IRAQI, a/k/a ABU HAJER, ALI
MOHAMED, a/k/a OMAR, a/k/a ALI ABDELSEOUD MOHAMED, a/k/a ABU
OMAR, a/k/a HAYDARA, a/k/a TAYMOUR ALI NASSER, a/k/a AHMED
BAHAA ADAM, AYMAN AL ZAWAHIRI, a/k/a ABDEL MUAZ, a/k/a THE
DOCTOR, KHALED AL FAWWAZ, a/k/a ABU OMAR, a/k/a KHALED
ABDUL KHALED ABDUL RAHMAN, a/k/a HAMAD AL FAWWAZ, HAMAD,
IBRAHIM EIDAROUS, a/k/a IBRAHIM H.A. EIDAROUS, a/k/a DAOUD,
a/k/a ABU ABDULLAH, a/k/a IBRAHIM, BARY, a/k/a ADEL M.A.A.A.
BARY, a/k/a ABBAS, a/k/a ABU DIA, a/k/a ADEL, SAIF AL ADEL, a/k/a
SAIF, ABDULLAH AHMED ABDULLAH, a/k/a ABU MOHAMED EL MASRY,
a/k/a SALEH, a/k/a ABU MARIUM, MUHSIN MUSA MATWALLI ATWAH,
a/k/a ABDEL RAHMAN AL MUHAJER, a/k/a ABDEL RAHMAN, ANAS AL
LIBY, a/k/a NAZIH AL RAGHIE, a/k/a ANAS AL SEBAI, L'HOUSSIANE
KHERCHTOU, a/k/a ABU TALAL, a/k/a TALAL, a/k/a YUSUF, a/k/a
JOSEPH, a/k/a JAMAL, MOHAMED SULEIMAN AL NALFI, a/k/a NALFI,
a/k/a ABU MUSAB, a/k/a MOHAMED SULEIMAN ADAM, JAMAL AHMED
MOHAMMED AL-BADAWI, a/k/a ABU ABED AL RAHMAN AL-BADAWI,
FAHD AL-QUSO, a/k/a ABU HATHAYFAH AL-ADANI,
*Defendants.*[*]

————

Appeal from the United States District Court
for the Southern District of New York.
No. 1:98-cr-1023-9 — Lewis A. Kaplan, *Judge*.

————

ARGUED: MAY 8, 2013
DECIDED: OCTOBER 24, 2013

————

[*] The Clerk of Court is directed to amend the official caption in this case to conform
to the listing of the parties above.

Before: LEVAL, CABRANES, and PARKER, *Circuit Judges*.

————

Defendant Ahmed Khalfan Ghailani appeals his judgment of conviction, after a trial by jury in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), of conspiring to bomb the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. These bombings killed over two hundred people, and injured thousands more.

This appeal presents a question arising from the government's efforts to obtain actionable and time-sensitive intelligence necessary to thwart acts of terror, while still bringing those charged with committing crimes of terrorism against Americans to justice in an orderly fashion under the laws of our country. We are asked whether the Speedy Trial Clause of the Sixth Amendment of the Constitution prevents the United States from trying, on criminal charges in a district court, a defendant who was held abroad for several years by the Central Intelligence Agency ("CIA") and the Department of Defense while his indictment was pending. We also address whether the District Court erred in giving the jury a "conscious avoidance" instruction, and in sentencing the defendant to life in prison.

First, we conclude that, based upon a balancing of the factors set forth by the Supreme Court, the District Court correctly determined that, in the circumstances presented here, there was no violation of Ghailani's right under the Speedy Trial Clause of the Sixth Amendment. Second, we conclude that the District Court did not err in so charging the jury. Third, we conclude that a sentence of life imprisonment, based on a conviction for conspiring to destroy United States buildings and property and directly or proximately

causing the deaths of 224 people, was neither procedurally nor substantively unreasonable.

Affirmed.

————

> PETER ENRIQUE QUIJANO (Nancy Lee Ennis, Anna N. Sideris, *on the brief*), Quijano & Ennis, P.C., New York, NY, *for Defendant-Appellant*.
>
> MICHAEL FARBIARZ, Assistant United States Attorney (Harry A. Chernoff, Nicholas J. Lewin, Sean S. Buckley, Katherine Polk Failla, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant Ahmed Khalfan Ghailani appeals his judgment of conviction, entered January 25, 2011, after a trial by jury in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), of conspiring to bomb the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. The bombings, which occurred simultaneously on August 7, 1998, killed over two hundred people, and injured thousands more.

This appeal presents a question bound to arise from the government's efforts to obtain actionable and time-sensitive intelligence necessary to thwart acts of terror, while still bringing those charged with committing crimes of terrorism against Americans to justice in an orderly fashion under the laws of our

country. We are asked whether the Speedy Trial Clause of the Sixth Amendment of the Constitution prevents the United States from trying, on criminal charges in a district court, a defendant who was held abroad for several years by the Central Intelligence Agency ("CIA") and the Department of Defense while his indictment was pending.[1]

To determine whether trial delays caused a violation of a defendant's constitutional speedy trial right, we must, in each case, consider the public and private interests at stake by balancing four factors set forth by the Supreme Court. Those factors are: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly.

We conclude that, based upon a balancing of these four factors, the District Court correctly determined that, in the circumstances presented here, there was no violation of Ghailani's right under the Speedy Trial Clause of the Sixth Amendment. In so holding, we reject Ghailani's claim that the government may never, no matter how expeditiously it acts, bring a defendant to trial after detaining him for national security purposes. We also reject Ghailani's argument that the delay occasioned by national security concerns and preparations for trial before a military commission was so excessive as to bar the government from thereafter proceeding to trial. For well over a century, the Supreme Court has repeatedly held that the government may purposely delay trials for significant periods of time, so long as, on balance, the public and private interests render the delay reasonable. We also reject Ghailani's

---

[1] We note at the outset that Ghailani claims only violation of the Speedy Trial *Clause* of the Constitution, *not* of the Speedy Trial *Act*, 18 U.S.C. §§ 3161-3174, passed by Congress in 1974.

argument that he was prejudiced *for constitutional speedy trial purposes* by his treatment during his detention by the CIA. The Speedy Trial Clause protects defendants against prejudice caused by delays in their trials, not against the harms of interrogation.

Additionally, we address whether the District Court erred in (1) giving the jury a "conscious avoidance" instruction; and (2) sentencing the defendant to life in prison.

As for the conscious avoidance instruction, which permitted the jury to convict Ghailani if he purposely avoided confirming the likely goals of the criminal conspiracy, Ghailani argues that there was insufficient evidence for a rational juror to infer that he was aware of the likelihood that his efforts would contribute to the bombing of American embassies. This claim has no merit, and we hold that the District Court did not err in so charging the jury.

As for Ghailani's sentence, we conclude that a sentence of life imprisonment, based on a conviction for conspiring to destroy United States buildings and property and directly or proximately causing the deaths of 224 people, was neither procedurally nor substantively unreasonable.

## BACKGROUND[2]

On August 7, 1998, operatives of al Qaeda[3] simultaneously detonated explosives at the United States embassies in Nairobi,

---

[2] Because Ghailani appeals from a judgment of conviction entered after a jury trial, we draw the facts from the evidence presented at trial, viewed in the light most favorable to the government. *See, e.g.*, *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012); *United States v. Rosen*, 716 F.3d 691, 694 (2d Cir. 2013). To the extent that Ghailani challenges the District Court's denial of his motion to dismiss the indictment, we rely on the facts found by the District Court, with the exception of any clearly erroneous findings. *See United States v. Daley*, 702 F.3d 96, 99-100 (2d Cir. 2012).

[3] We have previously explained that

Kenya, and Dar es Salaam, Kenya. In Nairobi, the bombs killed two hundred and thirteen people, and injured approximately four thousand more. In Dar es Salaam, eleven died and eighty-five were injured.[4]

Sometime in 1996 or 1997, Ghailani and three other men—Fahid Mohammad Ally Msalam ("Msalam"), Sheikh Ahmed Swedan ("Swedan"), and Khalfan Khamis Mohamed ("K.K. Mohamed")—were recruited by al Qaeda to serve as its "East Africa crew," including serving as the logistics team for the bombings of the two American embassies. During 1997 and 1998, until the time of the bombings, Ghailani lived in Dar es Salaam. In the months leading up to the bombings, Ghailani procured a number of items necessary for building an explosive device on the back of a truck. First, Ghailani, accompanied by Msalam, purchased seven large metal tanks filled with flammable gas from two welders in Dar es Salaam. Second, Ghailani, this time accompanied by Swedan, bought a Nissan Atlas refrigeration truck from a broker with whom he was friendly. After the refrigeration unit had been removed, he

> [a]l Qaeda is the most notorious terrorist group presently pursuing *jihad* against the United States. In February 1998, its leaders, including Osama bin Laden and Ayman al Zawahiri, issued an infamous *fatwa* (religious decree) pronouncing it the individual duty of every Muslim to kill Americans and their allies—whether civilian or military—in any country where that could be done. For a detailed discussion of this *fatwa* and al Qaeda's terrorist activities up to 2004—including the 1998 bombings of American embassies in Kenya and Tanzania, which killed 224 people; the October 2000 bombing of the *USS Cole*, which took 17 lives; and the September 11, 2001 airplane attacks on the World Trade Center and the Pentagon, which killed 2,973 persons—see The National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (2004).

*United States v. Farhane*, 634 F.3d 127, 132 n.4 (2d Cir. 2011).

[4] For a detailed description of these events and the procedural history of the convictions of Ghailani's coconspirators, see *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 103-08 (2d Cir. 2008). We recount here only the facts directly relevant to this appeal.

had a welder install a stand for two large batteries, which was enclosed in a lockable compartment, and make several other unusual modifications to the truck. Finally, Ghailani hid blasting caps—small explosive devices that are often used to detonate larger secondary explosives—in a locked armoire in his home. These materials were ultimately brought to a private compound in Dar es Salaam, which had been rented by K.K. Mohamed and another conspirator, where the explosives were assembled and the Nissan Atlas was outfitted for its purpose.[5]

Ghailani did not remain in Dar es Salaam to witness the fruits of his labor. Just a day prior to the bombings, Ghailani, using a false passport, boarded a plane with several al Qaeda leaders and flew to Karachi, Pakistan. Several of Ghailani's coconspirators, were captured soon after the bombings. *See generally In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 101-08 (2d Cir. 2008). Although Ghailani was not among those captured, he was indicted along with them on December 16, 1998. The captured coconspirators were subsequently tried and convicted in the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) for their roles in the bombings.

Although Ghailani was indicted along with his associates in 1998, he eluded authorities for the next six years. Throughout that time—which included the attacks on the World Trade Center on September 11, 2001—Ghailani remained an active and engaged member of al Qaeda. He was finally captured abroad on July 25, 2004, and was held outside of the United States for approximately two years by the CIA. Judge Kaplan made the following factual findings regarding this period:

---

[5] For a more complete accounting of the extensive evidence demonstrating Ghailani's role in the planning and preparation of the embassy bombings, see *United States v. Ghailani*, 761 F. Supp. 2d 167, 173-84 (S.D.N.Y. 2011).

> Ghailani was detained and interrogated by the CIA outside of the United States for roughly two years. Many details of the [CIA's interrogation program] and its application to specific individuals remain classified. Nevertheless, it may be said that it sought to obtain critical, real-time intelligence about terrorist networks and plots by using a combination of so-called "standard" and "enhanced" interrogation techniques to question detainees thought to have particularly high-value intelligence information. These techniques were "designed to psychologically 'dislocate' the detainee, maximize his feeling of vulnerability and helplessness, and reduce or eliminate his will to resist [the United States government's] efforts to obtain critical intelligence."
>
> An individualized interrogation program was developed and approved for each detainee based on the unique personal, physical, and psychological characteristics of that individual. Not all interrogation techniques were used on all detainees. To the extent that they are relevant to the disposition of this motion, the details of Ghailani's experience in the CIA [interrogation program]—in particular, the specific interrogation techniques applied to him—are described in [a separate classified supplement]. Suffice it to say here that, on the record before the Court and as further explained in the [classified supplement], the CIA Program was effective in obtaining useful intelligence from Ghailani throughout his time in CIA custody.

*United States v. Ghailani*, 751 F. Supp. 2d 515, 522-23 (S.D.N.Y. 2010) (quoting the Draft Office of Medical Services Guidelines on Medical

and Psychological Support to Detainee Interrogations) (footnotes omitted) (second alteration in original).[6]

In September 2006, the CIA transferred Ghailani to the custody of the Department of Defense at Guantanamo Bay. In March 2007, a Combatant Status Review Tribunal ("CSRT"), comprised of three commissioned officers, held a hearing to review whether Ghailani was properly being held as a so-called "enemy combatant,"[7] and soon after, confirmed Ghailani's status as an

---

[6] The District Court made additional findings, relating to the details of Ghailani's interrogation and the information it yielded, in a separate classified supplement to its opinion denying Ghailani's motion to dismiss the indictment under the Speedy Trial Clause. *See Ghailani*, 751 F. Supp. 2d at 522 n.27. Because these facts are not necessary to our resolution of the issues before us in this appeal, we need not delve further into them here.

[7] In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court considered whether the Congressional resolution known as the "Authorization for Use of Military Force" (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001), permitted the detention of a citizen who qualified as an enemy combatant. Although the Supreme Court observed that "the Government ha[d] never provided any court with the full criteria that it uses in classifying individuals as [enemy combatants]," it accepted that the classification applied to "an individual who . . . was part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi*, 542 U.S. at 516 (plurality opinion) (internal quotation marks omitted). A plurality of the Supreme Court "conclude[d] that detention of individuals falling into the limited category [of enemy combatants], for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." *Id.* at 518; *but see id.* at 521 (plurality opinion) (stating that we "agree that indefinite detention for the purpose of interrogation is not authorized" and that "[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war" the legal basis for the prolonged detention of enemy combatants may "unravel"). The plurality qualified this detention authority, however, by "hold[ing] that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," *id.* at 533, and specifically found it "notable that military regulations already provide for such process in related instances, dictating that tribunals

enemy combatant. Almost exactly one year later, in March 2008, the government brought charges against Ghailani before a military commission for violations of the laws of war, in connection with the bombing of the embassy in Dar es Salaam and with his efforts as a part of al Qaeda in the years during which he remained a fugitive.

Military counsel was appointed for Ghailani in April 2008. In the months that followed, he worked separately with civilian lawyers to file in federal court two petitions—in May and in July 2008—for writs of habeas corpus. In neither petition did Ghailani refer to the right to a speedy trial, much less claim a violation of that right. In October 2008, Ghailani was arraigned before the Military Commission, and motion practice began. These proceedings only lasted a few months, however, because soon after taking office, President Obama suspended the military commissions by executive order.

Several months later, in March 2009, Ghailani asserted, for the first time, a right to a speedy trial in a third petition for habeas corpus, this time filed *pro se* in the Southern District of New York. In May, the government announced that it would try Ghailani in the Southern District of New York on the original indictment of 1998. He was then brought to New York and arraigned on June 9, 2009.

---

be made available to determine the status of enemy detainees who assert prisoner-of-war status under the Geneva Convention," *id*. at 538 (citing Headquarters Depts. of Army, Navy, Air Force, and Marine Corps, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8, ch. 1, § 1-6 (1997) ("Army Regulation 190-8")); *see also id*. at 541, 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (finding Hamdi's detention "forbidden" by statute but concurring in the judgment so that Hamdi may at least "offer evidence that he is not an enemy combatant"). Soon after, the Department of Defense created the CSRTs—which it based, at least in part, on Army Regulation 190-8—to permit all detainees an opportunity for review of their status as enemy combatants. *See Ghailani*, 751 F. Supp. 2d at 524.

Ghailani, represented by counsel, subsequently moved to dismiss the indictment on the ground that the Speedy Trial Clause of the Sixth Amendment precluded the government from proceeding against him, inasmuch as he had been held for nearly five years by the United States before being presented for trial. In a careful and thoughtful Opinion issued on July 13, 2010, the District Court denied the motion. Specifically, Judge Kaplan concluded that, "[c]onsidering all of the circumstances, particularly the lack of significant prejudice of the sort that the Speedy Trial Clause was intended to prevent, the delay in this case did not materially infringe upon any interest protected by the right to a speedy trial." *Ghailani*, 751 F. Supp. 2d at 541.

Trial began on October 12, 2010. After approximately four weeks of trial and a week of deliberation, the jury convicted Ghailani on one count of conspiring to destroy United States buildings and property, in violation of 18 U.S.C. § 844(f), (n). In so doing, the jury made a specific finding that Ghailani's conduct directly or proximately caused death to a person other than a conspirator.[8] The jury found Ghailani not guilty on an additional 281 counts. On January 25, 2011, the District Court sentenced Ghailani to a term of life in prison, and ordered him to pay restitution in the amount of nearly $34 million.

## DISCUSSION

Ghailani now argues that we must reverse his conviction for two reasons. First, he contends that the District Court should have

---

[8] Title 18 U.S.C. § 844(f)(3) provides that any person who conspires to destroy United States buildings and property "and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both."

granted his motion to dismiss the indictment on the basis of the Speedy Trial Clause. Second, he claims that the District Court erred by giving the jury a so-called "conscious avoidance" charge and, furthermore, that the charge given was flawed. Additionally, Ghailani protests that a life term was an unreasonable sentence under the circumstances. We address each of these three claims in turn.

## A. The Speedy Trial Clause

### 1. Applicable Law

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Though apparently straightforward, the contours of this right have proven difficult to describe, largely because what may be considered "speedy" is necessarily dependent on the nature of the trial and the parties' interests in the given case. Indeed, in attempting to define the meaning of the word "speedy" under the Sixth Amendment, the Supreme Court has found it "'amorphous,' 'slippery,' and 'necessarily relative.'" *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quoting *Barker v. Wingo*, 407 U.S. 514, 522 (1972)).

Much of the difficulty derives from the fact that the right to a speedy trial protects not just the interests of the defendant, but also the "societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker*, 407 U.S. at 519. Over time, the Supreme Court has distilled the defendant's interest in a speedy trial to three ingredients: "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986) (internal quotation marks omitted).

Similarly, the public has an interest in quickly bringing defendants to trial to prevent a backlog of cases that might permit dangerous criminals to linger unsupervised for extended periods of time while on bail, delay rehabilitation, and otherwise hinder the criminal justice system. *See Barker*, 407 U.S. at 519-20. On the other hand, "in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *United States v. Ewell*, 383 U.S. 116, 120 (1966).[9] In other words, both

---

[9] Not long ago, we recognized these very concerns in the related context of the Speedy Trial Act:

> Delay unquestionably can be prejudicial to an accused defendant. It can result in faded or lost memories, or even the death or other unavailability of witnesses. Likewise, in some circumstances, delay can be prejudicial to the public interest protected by the Act. On the other hand, failure to consider the harmlessness of certain errors under the Speedy Trial Act can result in perverse outcomes, including allowing serious crimes to go unpunished, and causing the objective of the Act to expedite the administration of criminal justice to be undermined. A case tried to a satisfactory conclusion a few days later than the Act specifies, without substantial adverse effect on anyone, can require costly retrial a year or more later, after appeal, dismissal of the indictment, and reindictment, in a manner causing vast expense, inefficiency, unfairness, and unjustifiable delay in the administration of criminal justice.

*United States v. Zedner*, 401 F.3d 36, 47 (2d Cir. 2005), *rev'd on other grounds*, 547 U.S. 489 (2006). Indeed, the Supreme Court has cautioned that the only possible remedy for a violation of the Speedy Trial *Clause*—dismissal of the indictment—is often "unsatisfactorily severe . . . because it means that a defendant who may be guilty of a serious crime will go free, without having been tried." *Barker*, 407 U.S. at 522. The "overzealous application of this remedy would infringe 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error.'" *Id.* at 522 n.16 (quoting *Ewell*, 383 U.S. at 121) (ellipses omitted).

defendants and the public have an interest in a system that is fair and reliable, which must often come at the expense of haste.[10]

Thus, the Supreme Court has recognized for more than a century that the constitutional right to a speedy trial is not "so unqualified and absolute" that it must prevail over "the demands of public justice." *Beavers v. Haubert*, 198 U.S. 77, 86 (1905). To the contrary, "[i]t is consistent with delays[,] depends upon circumstances . . . [and] does not preclude the rights of public justice." *Id.* at 87; *see also Brillon*, 556 U.S. at 89-90. Accordingly, the Sixth Amendment does not establish a requirement for a defendant to proceed to trial within a certain number of days.[11] *See Brillon*, 556 U.S. at 89-90. Instead, the concept of "speedy" depends in each case upon both the private and public interests in an efficient, fair, and effective justice system. *See Loud Hawk*, 474 U.S. at 312-13.

For these reasons, the Supreme Court has formulated a four-factor balancing test for evaluating a defendant's claim that his or her speedy trial right has been violated. In particular, we must consider: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to

---

[10] It bears noting that delay is frequently a tactic that favors the defendant, not the government, *see, e.g.*, *Brillon*, 556 U.S. at 90, 92; *Barker*, 407 U.S. at 534-36, and defendants may not always be eager to proceed quickly to trial and, perhaps, sentencing. As Edward Bennett Williams, one of the premier criminal defense attorneys in the latter half of the twentieth century, observed about delay from the perspective of a defendant, "[i]t was just as good as an acquittal, but didn't last as long." Carrie Johnson, *Showtime For Cisneros*, Legal Times, Sept. 6, 1999.

[11] A defendant's right to a speedy trial only attaches when he or she "is indicted, arrested, or otherwise officially accused." *United States v. MacDonald*, 456 U.S. 1, 6 (1982); *see also United States v. Marion*, 404 U.S. 307, 313 (1971).

bring the case to trial more quickly."[12] *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012) (relying on *Barker*, 407 U.S. at 530).

---

[12] The relative importance placed on each of the factors by the Supreme Court has varied over time. For example, in *MacDonald*, Chief Justice Burger, writing for the Court, explained:

> The Sixth Amendment right to a speedy trial is . . . not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

456 U.S. at 8. Ten years later, however, Justice Souter, then writing for the Court, expressed quite a different view. He emphasized that "the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence . . . [is] the most serious [of the forms of prejudice] because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (internal quotation marks, citations, and brackets omitted); *see also id.* at 662 (Thomas, *J.*, dissenting) (describing "two conflicting lines of authority, the one declaring that limiting the possibility that the defense will be impaired is an independent and fundamental objective of the Speedy Trial Clause, and the other declaring that it is not" (internal quotation marks, citations, and brackets omitted)).

Indeed, in *Reed v. Farley*, 512 U.S. 339 (1994), the Supreme Court further elevated the prejudice prong, stating that "[a] showing of prejudice is required to establish a violation of the Sixth Amendment Speedy Trial Clause." *Id.* at 353; *but see Barker*, 407 U.S. at 533 ("We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."). For our part, we have understood that "[a]lthough a showing of prejudice is not a prerequisite to finding a Sixth Amendment violation, courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice." *United States v. Cain*, 671 F.3d 271, 297 (2d Cir. 2012) (internal quotation marks and brackets omitted). Because we conclude that Ghailani was neither prejudiced within the meaning of the Sixth Amendment's Speedy Trial Clause, nor otherwise subjected to a speedy trial violation, we need not further pursue the evolution of the relative importance of the prejudice prong in the four-factor balancing test.

As we recently explained, "[t]he first of the *Barker* factors, the length of the delay, is in effect a threshold question: 'by definition, a defendant cannot complain that the government has denied him a speedy trial if it has, in fact, prosecuted his case with customary promptness.'" *Id.* (quoting *Doggett v. United States*, 505 U.S. 647, 652 (1992)) (brackets omitted). That is to say that we will only consider the other *Barker* factors when the defendant makes a showing that "that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay."[13] *Doggett*, 505 U.S. at 651-52 (quoting *Barker*, 407 U.S. at 530-31).

Once the defendant has demonstrated a "presumptively prejudicial" delay, we must proceed to balance the four *Barker* factors, remaining mindful that "they are related factors" with "no talismanic qualities" that "must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533; *see also Brillon*, 556 U.S. at 91 (noting that "*Barker*'s formulation necessarily compels courts to approach speedy trial cases on an *ad hoc* basis" (internal quotation marks omitted)). Because *Barker*'s standard requires courts to "engage in a difficult and sensitive balancing process," 407 U.S. at 533, we have confirmed that "the considerations involved in applying the critical balancing test are confided to the trial court's discretion," *United States v. Tantalo*, 680 F.2d 903, 910 (2d Cir. 1982). We therefore rely on the facts found by

---

[13] As with other issues in this area of the law, the definition of "presumptively prejudicial" remains less than precise. *See United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) ("It comes as no surprise that courts have been unable to define 'presumptively prejudicial.'"); *cf. Doggett*, 505 U.S. at 652 n.1 (noting, without further comment, that lower courts generally had found delay to cross this threshold "at least as it approaches one year"). In any case, the circumstances presented by Ghailani's detention do not require us to parse this term further, inasmuch as he was held for over five years prior to trial and the government does not contest that this period was "presumptively prejudicial." Gov't Br. 42 n.*.

the District Court, with the exception of any clearly erroneous findings. *See United States v. Daley*, 702 F.3d 96, 99-100 (2d Cir. 2012); *cf. Doggett*, 505 U.S. at 652 (affording "considerable deference" to the trial court's determination that the government was negligent in failing to proceed speedily to trial).

Although we have stated that "[w]e review the district court's balancing of [the *Barker*] factors for abuse of discretion," *Cain*, 671 F.3d at 296, a determination whether someone's constitutional rights have been violated is rarely viewed as a matter truly left to district court "discretion." Rather, as we have had many occasions to note, "abuse of discretion" is a term of art, and is more properly understood to refer to occasions when a district court "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotations marks and citation omitted); *see also Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168–69 & nn.4–6 (2d Cir. 2001). That range of permissible decisions may vary considerably depending on the issue. *See* Joseph T. Sneed, Trial-Court Discretion: Its Exercise by Trial Courts and Its Review by Appellate Courts, 13 J. App. Prac. & Process 201, 202, 207 (2012) (commentary by the late Judge Sneed, a former Dean of the Duke Law School, on the several possible meanings of the term of art "abuse of discretion"). Under the standard thus viewed, in evaluating a defendant's rights under the Speedy Trial Clause, a district court is in no better position than a reviewing court to undertake the required balancing. Indeed, it is improbable that we would approve opposite decisions as to two identically-placed defendants on the basis that each decision was within the trial judge's discretion. Accordingly, we consider whether the District Court here erred in balancing the *Barker* factors.

## 2. The District Court's Decision

In ruling on Ghailani's constitutional objection to the delay from the start of his detention in CIA custody to his arraignment in New York on June 9, 2009, Judge Kaplan carefully evaluated each of the four *Barker* factors. First, Judge Kaplan found that the "length of the delay" protested by Ghailani was nearly five years.[14] *Ghailani*, 751 F. Supp. 2d at 529.

Second, Judge Kaplan addressed Ghailani's invocation of his right to a speedy trial. He determined that "*Barker*'s demand factor does not cut one way or the other in this case [because] Ghailani cannot be faulted for having failed to invoke his right to a speedy trial earlier than he did[, n]or can the government be criticized for ignoring demands for a trial." *Id.* at 530.

Third, Judge Kaplan considered whether the five-year delay prejudiced Ghailani. The judge found that Ghailani was not prejudiced by any physical or emotional abuse inflicted during his detention by the CIA, since any such harm was not related to his *pretrial* detention—rather, it was related to the government's separate efforts to obtain valuable intelligence. *See id.* at 531-32. Further, Judge Kaplan found that Ghailani's preparation for trial was not prejudiced by any delay because "he ha[d] not identified any particular witness who has become unavailable as a result of this delay." *Id.* at 532-33. Finally, he found that the government's delay in announcing it was *not* seeking the death penalty in this case did not cause anxiety of the "sort [that] would constitute prejudice for speedy trial purposes." *Id.* at 533.

---

[14] Ghailani conceded before the District Court, as he does again on appeal, that the time during which he remained at large after his indictment but before his capture does not constitute part of the period of "delay" for the purposes of evaluating his claim under the Speedy Trial Clause. *See Ghailani*, 751 F. Supp. 2d at 529; Appellant Br. 51.

Fourth, Judge Kaplan evaluated the government's reasons for delay. In doing so, he divided the period of delay into two phases. He concluded that the first phase, during which Ghailani was held by the CIA from July 2004 through September 2006, was entirely justifiable because "the decision to place Ghailani in the CIA Program was made in the reasonable belief that he had valuable information essential to combating Al Qaeda and protecting national security" and because "the evidence show[ed] that the government had reason to believe that this valuable intelligence could not have been obtained except by putting Ghailani into that program and that it could not successfully have done so and prosecuted him in federal court at the same time." *Id.* at 535.

The second phase, from September 2006 through June 2009, during which time Ghailani was held at Guantanamo Bay, was considerably more complicated. As to that time period, Judge Kaplan determined that "there is no evidence that the government ever acted in bad faith to gain a tactical advantage over or to prejudice Ghailani with respect to his defense of this indictment."[15]

---

[15] In *Barker*, the Supreme Court articulated the following framework for the "reason for delay" factor:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531 (footnote omitted); *see also id.* at 531 n.32 ("We have indicated on previous occasions that it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over [defendants] or to harass them.'" (quoting *Marion*, 404 U.S. at 325) (alteration in original)).

*Id.* at 534. However, Judge Kaplan also concluded that the government's reasons for holding Ghailani at Guantanamo Bay without trial on his federal court indictment, while not in bad faith, nevertheless weighed against the government. In particular, Judge Kaplan observed that "while the executive branch was entitled to decide where it would hold Ghailani to prevent him from resuming hostilities against the United States, the government is responsible for the delay caused by that decision." *Id.* at 537. Similarly, the delay could not be justified by the government's initial decision to proceed before the CSRT and then by military commission. *See id.* at 537-39. While these decisions may not have been made in bad faith, neutral decisions that delay a trial must nonetheless be counted against the government. *See id.* at 537 (relying on *Barker*, 407 U.S. at 531); *see also* note 15, *ante*.

Having addressed each *Barker* factor individually, Judge Kaplan proceeded to weigh them, and concluded that, "[c]onsidering all of the circumstances, particularly the lack of significant prejudice of the sort that the Speedy Trial Clause was intended to prevent, the delay in this case did not materially infringe upon any interest protected by the right to a speedy trial." *Ghailani*, 751 F. Supp. 2d at 541.

### 3. Analysis

Ghailani now asserts that the District Court made two principal errors in evaluating his speedy trial claim. First, he contends that national security interests and preparation for his then-intended trial before a military commission cannot justify the delay incurred. Second, he argues that the District Court was incorrect in finding that he did not suffer prejudice as a result of the delay. Ultimately, of course, he claims that the *Barker* factors

demonstrate a violation of his rights under the Speedy Trial Clause, and, thus, require us to reverse his conviction.

Ghailani's claim is based on the delay from the time he first came into the exclusive custody of the United States following his July 25, 2004 capture until his June 9, 2009 arraignment in the District Court.[16] The period he protests covers approximately five years and can be viewed as divided into two segments based on the changing concerns that caused the delay. The delay from the beginning of his custody until his transfer to Guantanamo was caused by national security concerns. The delay from his transfer until his arraignment was caused by preparations for trial before a military commission. We agree with Judge Kaplan that this period was long enough to trigger the *Barker* analysis. Accordingly, we discuss each *Barker* factor in turn, paying particular attention to the errors claimed by Ghailani in the District Court's analysis.

### i. Reasons for Delay

### a. National Security

As for his claim that the interests of national security cannot justify delaying his trial, Ghailani proposes that "[u]pon seizing [him], the government had a choice: It could either choose to accord him his Constitutional right to a speedy trial on the existing indictment, or it could choose to strip him of an array of Constitutional rights and hold him in a Black Site for questioning. Emphatically, however, the government could not do both." Appellant Br. 56. In other words, according to Ghailani's brief and presentation at oral argument, his detention for national security

---

[16] Ghailani does not argue that any further delay from his arraignment in the District Court until the trial began on October 12, 2010, violated his right to a speedy trial under the Sixth Amendment.

purposes may well have been proper, but it precluded the government from *ever* bringing him to justice in our civilian courts for his crimes under United States law because, in Ghailani's view, it constituted an automatic violation of his rights guaranteed by the Speedy Trial Clause. *Id.* Ghailani offers no case law or other authority that supports this view, and for good reason—the Speedy Trial Clause of the Sixth Amendment does not create any such rule.

To the extent that Ghailani suggests generally that the government may not choose, for policy reasons, to delay his trial, his claim is rebutted by an unbroken line of cases going back well over a century, each of which has permitted the government purposely to delay trials for significant periods of time, so long as, on balance, the public and private interests rendered the delay reasonable. For example, the Supreme Court has approved delays for the government to prosecute the defendant in another jurisdiction first, *see Beavers*, 198 U.S. at 84-87, for the government to pursue interlocutory appeals, *see Loud Hawk*, 474 U.S. at 312-13, and for the government to prosecute a separate defendant in order to secure his testimony at trial, *see Barker*, 407 U.S. at 516-18. Following these precedents, we have, upon balancing the *Barker* factors, allowed delays for the government to keep co-defendants from fleeing, avoid risk to informants, and protect the integrity of an investigation, *see United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988), for the government to persuade a witness to testify, *see United States v. Vassell*, 970 F.2d 1162, 1165 (2d Cir. 1992), and for the government to decide whether to pursue the death penalty, *see United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008).

In each of these cases, the government made a deliberate choice to sacrifice proceeding to trial more quickly in favor of what it deemed to be in the public interest. Indeed, although a delay intended unfairly to interfere with the defense or purely to harass

the defendant would count quite heavily in favor of a violation of the Speedy Trial Clause, *see Barker*, 407 U.S. at 531, the Speedy Trial Clause prohibits only trial delays that, on balance, are unreasonable in light of the public and private interests at stake *in the particular case. See, e.g.*, *Loud Hawk*, 474 U.S. at 312-17 (employing the *Barker* factors to weigh the public and private interests in the delay attendant to government taking interlocutory appeals); *Ewell*, 383 U.S. at 120 ("A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."). In other words, a delay does not render a trial not "speedy" under the Constitution merely because the government intended to cause the delay.

To the extent that Ghailani nonetheless contends specifically that national security cannot justify pretrial delay, his argument is no more convincing. As we have now made abundantly clear, the definition of a "speedy" trial under the Sixth Amendment depends in each case in part upon the public interest that may weigh in favor of delay. *See, e.g.*, *Loud Hawk*, 474 U.S. at 313; *Barker*, 407 U.S. at 530-31. And the Supreme Court has stated in no uncertain terms that "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)). Indeed, we have previously invoked "our traditional deference to the judgment of the executive department in matters of foreign policy" in denying a claim that the government's failure to extradite a defendant violated his right to a speedy trial. *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir. 1988) (internal quotation marks omitted). We see little reason not to accord a similar deference—at least when the government has made a showing that, on balance, the other *Barker* factors do not outweigh the reason for delay—in the context of national security.

It is true that national security is a somewhat unusual cause for trial delay in that it is not related to the trial itself. But we observe nothing in the text or history of the Speedy Trial Clause that requires the government to choose between national security and an orderly and fair justice system. To the contrary, the Speedy Trial Clause preserves both the interests of defendants and the societal interest in the integrity of the justice system by balancing those interests to determine whether the requirements of the Clause have been violated. We observe no basis for, and reject in full, Ghailani's argument that, once having detained a defendant as a national security intelligence asset, the government can no longer bring the defendant to trial. Ghailani's suggestion that the government *must* detain defendants who pose a threat to national security indefinitely rather than bring them to trial for their crimes in the manner consistent with our traditional notions of justice would hardly advance the interests of defendants or the values underpinning the Speedy Trial Clause.

We reject also Ghailani's fallback position that the delay occasioned by national security concerns was so excessive as to bar the government from thereafter proceeding to trial. There is no simple bright-line answer to the question of how much delay by reason of national security concerns is consistent with the government's right to proceed thereafter to trial. In previous cases, the Supreme Court has held that delays of upwards of five and seven years did not violate the Speedy Trial Clause in the circumstances presented. *See Loud Hawk*, 474 U.S. at 315-17 (more than seven years); *Barker*, 407 U.S. at 533-34 ("well over five years"). We have previously found circumstances which permitted delays of five, six, and seven years. *See Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988) (over seven years); *United States v. Lane*, 561 F.2d 1075, 1078 (2d Cir. 1977) (58 months); *United States v. Saglimbene*, 471 F.2d 16, 17 (2d Cir. 1972) (six years).

While the delay here was undoubtedly considerable, the District Court correctly determined that other factors strongly favor the government. As the District Court found, "the decision to place Ghailani in the CIA Program was made in the reasonable belief that he had valuable information essential to combating Al Qaeda and protecting national security" and "the evidence show[ed] that the government had reason to believe that this valuable intelligence could not have been obtained except by putting Ghailani into that program and that it could not successfully have done so and prosecuted him in federal court at the same time." *Ghailani*, 751 F. Supp. 2d at 535. In this context—and we emphasize that this question must be considered in the specific factual circumstances of each case—we do not think that the approximately two-year delay caused by national security concerns was so excessive as to bar Ghailani's prosecution.

Ghailani further contends that "once the specter of a national security threat has been raised, there [will be] no necessity for a further *Barker* analysis." Appellant Br. 56. We are not concerned that permitting a delay based on the weighty national security interests present in this case will somehow undo the Speedy Trial Clause for all future cases. Judge Kaplan's opinion in this case—which carefully and thoroughly weighed the evidence presented by the government before concluding that the delay did not amount to a speedy trial violation—did not announce any such general rule, nor does this Opinion. The District Court did not forgo the *Barker* analysis in deference to national security concerns. To the contrary, it addressed each factor and determined that, on balance, the speed with which the government brought Ghailani to trial was constitutionally sufficient. The District Court's analysis (and this Opinion) confirms that, under the *Barker* analysis, the weight of a national security justification for delay—just like any other

justification—will depend on the facts and circumstances of each case.

In the final analysis, the Sixth Amendment right to a speedy trial is just that: a right to proceed to trial in a manner that is sufficiently expeditious under the circumstances presented in the particular case. In this case, proceedings were permissibly and reasonably delayed by weighty considerations relating to national security. Accordingly, the delay of Ghailani's trial while he was in CIA custody was justified under the *Barker* framework, *see* 407 U.S. at 531, and does not weigh against the government in the balancing of the factors.

### b.  Preparations for Trial before a Military Commission

In September 2006 Ghailani was placed in Department of Defense custody and transferred to Guantanamo Bay to be detained as an alien enemy combatant. On March 17, 2007, a CSRT hearing was held and Ghailani's classification as an alien enemy combatant sustained. He was thereafter held at Guantanamo Bay while military authorities prepared to prosecute him before a military commission. Upon President Obama's inauguration in January 2009, the military commission was suspended and the government altered course, preparing instead to try Ghailani in civilian court. Soon thereafter, on June 9, 2009, he was arraigned in the District Court.

Once again, while recognizing that the duration of the delay at Guantanamo Bay was substantial, we conclude that the pertinent factors sufficiently favor the government. We reject Ghailani's contention that the delay from September 2006 until June 9, 2009 requires dismissal of the charges against him.

The job of preparing to prosecute Ghailani before the military commission was unquestionably difficult. Although much of the

difficulty was a product of the government's own choices, the trial was proceeding under a new, untested legal regime and all events relevant to the charges occurred outside the United States and involved foreign actors and witnesses. Some significant period of delay was therefore reasonable. Ghailani contends this is rebutted by the government's acknowledgment that all of its preparation for the criminal trial was concluded prior to Ghailani coming into exclusive United States custody. This misconstrues the government's concession. The government indeed acknowledged that "every percipient witness called at Ghailani's [district court] trial was discovered and interviewed by federal law-enforcement officials before the defendant was captured in 2004 [and that] every piece of evidence offered at the . . . trial . . . was obtained before the defendant was captured." Appellee Br. 93. But the fact that the witnesses eventually called had already been interviewed, and the physical evidence eventually used had already been obtained, does not mean that all investigation had been accomplished, much less that trial preparation was complete. After all, preparation for trial in any case as complex as this case remains a huge undertaking.

We also agree with Judge Kaplan's determination that "there is no evidence that the government ever acted in bad faith to gain a tactical advantage over or to prejudice Ghailani with respect to his defense of th[e] indictment." *Ghailani*, 751 F. Supp at 534. Indeed, the record demonstrates that the government was not acting with the intent to cause prejudicial delay but, until President Obama took office in January 2009 and suspended the military commissions, was acting under the good faith belief that Ghailani would be tried by military commission. Undoubtedly, however, the delay caused by the government's original strategy to try Ghailani before a military commission was long, and largely a product of the government's own choices. We agree, therefore, with the District Court's conclusion that the reasons for this delay weigh against the

government. However, as explained more fully below, on balance, consideration of all the pertinent factors favors the government and requires denial of Ghailani's claim that he is entitled to have the indictment dismissed.[17]

### ii.  Invocation of the Right

We note that throughout the period of delay at issue, Ghailani never demanded a speedy trial. His March 2009 petition for habeas corpus did not seek a speedy trial, but rather, demanded his release and dismissal of the indictment with prejudice. Generally, failure to demand a speedy trial makes it difficult for a defendant to prove that he was denied a speedy trial. *See Barker*, 407 U.S. at 532. Here, the District Court addressed Ghailani's invocation of his right to a speedy trial and determined that "*Barker*'s demand factor does not cut one way or the other in this case [because] Ghailani cannot be faulted for having failed to invoke his right to a speedy trial earlier than he did[, n]or can the government be criticized for ignoring demands for a trial." *Id.* at 530. We agree with Judge Kaplan's conclusion that this factor does not affect the balancing test he was required to apply.

### iii. Prejudice

Ghailani next argues that the District Court erred in its consideration of whether he was prejudiced by the delay in his case. Most significantly, Ghailani contends that the District Court should have considered the physical and psychological harm he endured while in CIA custody as prejudice supporting his speedy trial claim.

---

[17] The government contends that the period Ghailani was detained at Guantanamo Bay was justified on national security grounds as well, in part based on its interest in detaining him as an enemy combatant and holding him accountable for violations of the laws of war. We agree with Judge Kaplan's conclusion that "while the executive branch was entitled to decide where it would hold Ghailani to prevent him from resuming hostilities against the United States, the government is responsible for the delay caused by that decision." 751 F. Supp. 2d at 537.

The District Court concluded, however, that whatever treatment Ghailani endured at the hands of the CIA was not caused by the delay in his trial and therefore not relevant to the *Barker* analysis. *See Ghailani*, 751 F. Supp. 2d at 531-32.

We agree with Judge Kaplan. The Supreme Court has consistently emphasized three interests of a defendant that may be prejudiced by trial delay: "'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the accused's defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532) (brackets omitted). Ghailani complains of oppressive pretrial incarceration, but notably, his detention by the CIA was not "pretrial," as it was not incarceration for the purpose of awaiting trial. In other words, Ghailani would have been detained by the CIA for the purpose of obtaining information whether or not he was awaiting trial, and the conditions of his detention were a product of the CIA's investigation, not incarceration as a prelude to trial.[18]

We have denied a speedy trial claim in similar circumstances, explaining that the defendant could not "claim prejudice traceable to any oppressive pretrial incarceration, because he would have been serving his state sentence in any event." *United States v. Lainez-Leiva*, 129 F.3d 89, 92 (2d Cir. 1997). Other circuits have held much the same. *See, e.g., United States v. Knight*, 562 F.3d 1314, 1324 (11th Cir. 2009) ("Although [the defendant] complains about the conditions of his detention in a maximum-security facility, he would have been

---

[18] We also note that the impact on this trial of any physical or psychological harm that Ghailani suffered while in CIA custody has already been addressed in other ways. Ghailani previously attempted unsuccessfully to challenge the entire prosecution under the Due Process Clause in light of the alleged "outrageous government conduct" during his CIA interrogation. *See United States v. Ghailani*, 751 F. Supp. 2d 502 (S.D.N.Y. 2010). He also underwent a psychiatric evaluation, at Judge Kaplan's order, to ensure that any physical or psychological harm Ghailani suffered did not render him unfit to stand trial or unable to assist in his defense. *See Ghailani*, 751 F. Supp. 2d at 532.

otherwise serving a state sentence of imprisonment and was housed in the maximum-security facility because of his earlier escape."); *United States v. Watford*, 468 F.3d 891, 907 (6th Cir. 2006); *United States v. Sprouts*, 282 F.3d 1037, 1043 (8th Cir. 2002); *United States v. Grimmond*, 137 F.3d 823, 830 (4th Cir. 1998). In sum, the Speedy Trial Clause protects defendants against prejudice caused by delays in their trials, not against the harms of interrogation of enemy combatants.

Finally, Ghailani contends that the District Court incorrectly determined that his defense was not prejudiced by the pretrial delay. Notably, Ghailani fails to make any argument addressing the prejudice at the core of the Speedy Trial right—that the delay of the trial itself (as opposed to other government conduct occurring during the delay) caused prejudice, such as through the fading of memories or unavailability of witnesses. Ghailani makes other arguments, however, including a number related to the idea that the government gained an informational advantage from Ghailani's interrogation, that he was denied a fair and impartial jury due to pretrial publicity, that he was denied the opportunity to gain the benefit of a cooperation agreement, and that federal agents interfered with his military lawyer's efforts to contact witnesses.

These claims of prejudice all fail, however. Several were not raised below and are thus not properly before us on appeal. Many are cursory, completely unsupported, or were not caused by the delay and were properly remedied in other ways. As Ghailani has not demonstrated any substantial prejudice resulting from the delay in his trial, we find that this factor weighs in the government's favor. Although Ghailani points to several theoretical effects the delay might have had on his preparation for trial, he has identified nothing that would lead us to conclude that the District Court erred.

*   *   *

For the foregoing reasons, Ghailani has failed to demonstrate that the District Court's denial of his motion to dismiss the indictment for violation of the Speedy Trial Clause was based on any error of law or clearly erroneous factual finding. Further, we agree with the District Court's conclusion that "[c]onsidering all of the circumstances, particularly the lack of significant prejudice of the sort that the Speedy Trial Clause was intended to prevent, the delay in this case did not materially infringe upon any interest protected by the right to a speedy trial." *Ghailani*, 751 F. Supp. 2d at 541. Therefore, based upon a balancing of the factors set forth by the Supreme Court in *Barker*, the District Court correctly concluded that, in the circumstances presented here, Ghailani's trial did not violate the Speedy Trial Clause of the Sixth Amendment.

## B. Conscious Avoidance Charge

Ghailani next challenges both the District Court's decision to issue a "conscious avoidance" charge to the jury and the specific formulation of that charge. "As a general matter, we review a properly preserved claim of error regarding jury instructions *de novo*, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (internal quotation marks omitted). However, when a defendant, as here, objects only generally to the issuance of a jury instruction, and not to the specific language used by the District Court, the objection to the formulation of the charge is not preserved. *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). In such cases, we review the challenge to the language of the jury charge for plain error, *see United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013), which occurs when "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the

error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings," *United States v. Marcus*, 560 U.S. 258, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks and brackets omitted). Put simply, "to be plain, an error of the district court must be obviously wrong in light of existing law." *United States v. Tarbell*, 728 F.3d 122, 126 (2d Cir. 2013) (brackets omitted).

A "conscious avoidance" charge allows "a jury to convict a defendant for deliberately closing his eyes to what would otherwise have been obvious to him." *United States v. Goffer*, 721 F.3d 113, 126 (2d Cir. 2013) (internal quotation marks and brackets omitted). In other words, "[a] conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact." *Coplan*, 703 F.3d at 89 (internal quotation marks omitted). As we recently reaffirmed, a conscious avoidance instruction may be given only if "the appropriate factual predicate for the charge exists, i.e. the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Goffer*, 721 F.3d at 127 (internal quotation marks omitted).

Ghailani argues that there was an insufficient factual predicate for the charge. In his view, the "evidence could not support an inference that Mr. Ghailani should have known that his associates were planning to (1) bomb American facilities anywhere in the world, including the American embassies in Nairobi and Dar es Salaam; (2) attack employees in the American Government stationed at those facilities; and (3) attack military installations and

members of the American military stationed at such military installations in Saudi Arabia, Yemen, Somalia and elsewhere with bombs, but purposely decided to ignore[ ] the signs." Appellant Br. 103-04.

This claim is without merit. As Judge Kaplan explained, there was extensive evidence introduced at trial from which a rational juror could conclude that Ghailani was aware of a high probability that he was involved in a plot to detonate explosives, including that "Ghailani and his associates bought a truck that he could not drive and gas cylinders for which neither he nor they had any known use save as bomb components" and that Ghailani "possessed a large quantity of detonators or blasting caps of the sort used in making the truck bombs." *United States v. Ghailani*, 761 F. Supp. 2d 167, 197 (S.D.N.Y. 2011).[19] There was also more than sufficient evidence that Ghailani was aware of a high probability that the plot involved bombing properties of the United States. As Judge Kaplan explained, "there was ample evidence that Al Qaeda effectively had declared war on the United States and Americans generally, civilian as well as military. It regarded U.S. embassies as attractive targets. Ghailani was well acquainted and associated closely with Al Qaeda members and operatives whom the jury reasonably could have found to have known of these objectives and shared them with Ghailani." *Id.* Based on our independent review of the record, we agree that there was a proper factual predicate for the issuance of a conscious avoidance charge.

---

[19] Indeed, after the jury had rendered its verdict, Ghailani's trial counsel conceded that "it is more than reasonable to believe that at most what Ghailani is assuming is that there was a conspiracy to bomb something." App'x 1568.

We similarly find no support for Ghailani's claim that the District Court's charge was improperly formulated. Ghailani focuses on the District Court's instruction that

> if you find that the defendant was aware of a high probability that a fact was so, and that the defendant acted with deliberate disregard of the facts, you may find that the defendant acted knowingly. However, if you find that the defendant actually believed that the fact was not so, then he may not have acted knowingly with respect to whatever charge you are considering.

Trial Tr. 2462. According to Ghailani, this instruction lacks the "'balancing' language necessary to instruct the jury that if they find that the defendant actually believed that his conduct was lawful, they must acquit." Appellant Br. 107 (relying on *United States v. Schultz*, 333 F.3d 393, 413-14 (2d Cir. 2003)). Ghailani's contention seems to be that, notwithstanding that Judge Kaplan explained that "if you find that the defendant actually believed that the fact was not so, then he may not have acted knowingly," Trial Tr. 2462, the instruction was improper because it did not explicitly state that in that event, acquittal would be appropriate. Appellant Br. 107.

It is true that in *Schultz* we indicated that a "district judge should instruct the jury that knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist." 333 F.3d at 413 (internal quotation marks omitted). However, we also recalled that "'[w]e cannot place the talismanic weight urged by the defendant on the exact wording of a controlling opinion and do not believe the district court needed to echo the opinion paragraph by paragraph to convey adequately its import to the jury." *Id.* at 414 (quoting *United States v. Schatzle*, 901 F.2d 252,

255 (2d Cir. 1990)) (brackets omitted). Indeed, a district court "enjoys broad discretion in crafting its instructions, which is only circumscribed by the requirement that the charge be fair to both sides." *Coplan*, 703 F.3d at 87 (internal quotation marks and brackets omitted).

More to the point, we do not discern how the District Court's language failed to convey the required concepts to the jury. In fact, we recently approved—albeit without objection from the defendant—a similar instruction on conscious avoidance. *See United States v. Cuti*, 720 F.3d 453, 462-63 (2d Cir. 2013). As already discussed, Ghailani failed to preserve his objection to the language used by District Court, *see* App'x 1071-82, requiring us to review his claim on appeal for plain error. We observe no error, let alone plain error, in the District Court's conscious avoidance charge.[20]

## C. Sentencing

Ghailani challenges his sentence of life imprisonment as both procedurally and substantively unreasonable. We generally review sentences for reasonableness, which "requires an examination of the length of the sentence (substantive reasonableness) as well as the procedure employed in arriving at the sentence (procedural reasonableness)." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). We recently described procedural and substantive unreasonableness as follows:

---

[20] To the extent that Ghailani argues, in a supplemental letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), that the Supreme Court's holding in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), rendered the District Court's conscious avoidance charge improper for failure to require that the jury find that the defendant took deliberate actions to avoid learning of the objects of the conspiracy, we specifically rejected that claim in *United States v. Goffer*, 721 F.3d 113, 127-28 (2d Cir. 2013).

> A district court errs *procedurally* when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence. A district court errs *substantively* if its sentence cannot be located within the range of permissible decisions. In reviewing the substantive reasonableness of a sentence, we take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts.

*United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) (internal quotation marks and citations omitted; emphases supplied). In simpler terms, we review sentences for "abuse of discretion." *Id.*; *see also In re Sims*, 534 F.3d at 132 (defining the term of art "abuse of discretion," as discussed in Part A.1, *ante*).

First, Ghailani argues that the District Court erred procedurally by failing to hold a so-called *Fatico* hearing[21] before considering certain out-of-court statements. We identify no error, much less an abuse of discretion, in the District Court's decision not to hold a *Fatico* hearing. We recently noted that "it is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the [g]overnment's allegations." *United States v. Broxmeyer*, 699 F.3d 265, 280 (2d Cir. 2012) (internal

---

[21] "A '*Fatico*' hearing is a sentencing hearing at which the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (referring to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979)).

quotation marks omitted). Indeed, a *Fatico* hearing was particularly unnecessary in Ghailani's case because the District Court repeatedly and explicitly stated that the hearsay complained of would "not affect the sentence." App'x 1646; *see also id.* at 1647 ("I reiterate that my findings on these points do not affect the sentence."). In short, there was no error in the District Court's decision not to hold a *Fatico* hearing.

Second, Ghailani contends that the District Court "failed to address [his] specific request to craft a sentence which would properly reflect the vast distinction between his conviction on one count of this indictment, and the previous convictions of his co-defendants." Appellant Br. 116. Under 18 U.S.C. § 3553(a)(6), among the factors that a judge must consider at sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." However, we have repeatedly made clear that "section 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). As the record discloses, "the District Court properly calculated the Guidelines range, treated the range as appropriately advisory, considered the Section 3553(a) factors, selected a sentence based on facts that were not clearly erroneous, and adequately explained its chosen sentence, which was in the Guidelines range." *United States v. Alvarado*, 720 F.3d 153, 159 (2d Cir. 2013). No additional comparisons between Ghailani's sentence and those of his co-conspirators were necessary.

Third, Ghailani claims that his sentence was substantively unreasonable. We disagree. In the circumstances of this case, there was nothing unreasonable about sentencing this defendant to life in prison based on a conviction for conspiring to destroy United States

buildings and property, and directly or proximately causing the deaths of 224 people. We are particularly unconvinced by Ghailani's claim that "there was something fundamentally unfair and unjust in imposing upon [him] the same sentence meted out to the prior co-defendants tried in 2001, all of whom were convicted of all of the more serious counts which carried mandatory sentences." Appellant Br. 141. Ghailani offers no authority, nor do we find any, for the suggestion that a sentence should in some way correlate to the number of counts of conviction, as opposed to the nature of the defendant's criminal conduct. Nor do we observe any support in law or logic for the notion that, no matter how heinous a defendant's crime, a life sentence is inappropriate whenever a co-defendant has killed one more person.

> In the words of the experienced District Judge:
>
> The offense was horrific. It far outweighs any and all other considerations that have been advanced on behalf of the defendant. A sentence must be imposed that in addition to other things makes it crystal clear that other who engage or contemplate engaging in deadly acts of terrorism risk enormously serious consequences.

App'x 1713. A sentence of life imprisonment for Ghailani was far from unreasonable.

## CONCLUSION

To summarize:

(1)     In the circumstances presented here, the District Court did not err (or "abuse its discretion," as that term is properly understood) in determining that the nearly five-year delay between the defendant's capture and his

arraignment, during which time he was interrogated as an enemy combatant and detained at Guantanamo Bay, did not constitute a violation of the Speedy Trial Clause of the Sixth Amendment.

(2)    The District Court did not err either in charging the jury with a conscious avoidance instruction or in formulating that instruction.

(3)    The defendant's sentence of life imprisonment, based on a conviction for conspiring to destroy United States buildings and property and directly or proximately causing the deaths of 224 people, was neither procedurally nor substantively unreasonable.

In sum, Judge Kaplan presided over this challenging and complex case with exemplary care and fairness, and we detect no error in the various difficult matters decided throughout the proceedings.

Accordingly, the judgment of the District Court is **AFFIRMED**.